[No. S004787. Oct. 24, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED HARLAN FREEMAN, Defendant and Appellant.

459

COUNSEL

Alvin H. Goldstein, Jr., under appointment by the Supreme Court, Mark L. Musto, Kelly B. Valen and Goldstein & Phillips for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Morris Beatus, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—In January 1984, Donald Koger was killed during the robbery of a bar in Berkeley. Following trial of defendant and a coparticipant, Paul Gutierrez, the jury convicted defendant of several crimes arising out of the incident, including murder, five counts of robbery and three counts of attempted robbery, all with the personal use of a firearm. The jury also found true the special circumstance that the murder was committed in the commission of robbery. Outside the presence of the jury, defendant admitted three prior felony convictions. After the penalty trial, the jury imposed the death penalty. The court denied defendant's automatic motion to modify the verdict, and sentenced defendant to death. This appeal is automatic. We affirm.

I. FACTS

A. *Guilt Phase*

1. *Prosecution Evidence*

The Gilman Street Exit, a neighborhood bar in Berkeley, was open for business as usual the evening of January 11, 1984. Paul Urone was the bartender, and Julie Gray was in charge of the kitchen. Most of the patrons were regulars. That night they included the victim, Donald Koger, a gardener nicknamed "Cowboy." Seated next to Koger was a psychiatrist, Darol Rice. Also in the bar were Dottie Hansen, a friend of Urone's, and, seated next to her, Norwood Square. At one end of the bar were Verna Ratterman, Bob Rideout and Jean Lipari.

Around 11 p.m., a man identified as the codefendant at trial, Paul Gutierrez, entered the bar wearing a baseball cap, and sat down about three stools

away from Koger. Gutierrez ordered a beer. About 10 or 15 minutes later, 2 other men entered and sat down at the far end of the bar. One, identified as defendant, ordered a beer. The other, who has never been identified, went to the men's room, then returned and also ordered a beer. After serving these two, Urone continued his bartending duties, and walked in front of Gutierrez.

Suddenly, Gutierrez stood up and "put a gun" on Urone. Urone understood that it was a "hold up." He told the others to be "cool," and told Gutierrez not to hurt anyone. He then saw the two men who had just entered the bar also stand up wielding guns and realized that "it was a party of three." He started to go to the cash register to get the money, but Gutierrez said, "Not yet, freeze."

Defendant approached Koger. Rice and Ratterman heard Koger say, "Fuck you." Defendant shot Koger in the left side of the head, killing him. Koger "keeled over" onto the floor.

Just before or just after defendant shot Koger, Gutierrez fired a shot into the bar. Gutierrez then demanded that Urone put the money from the cash register into a shoulder bag. Urone complied. Gutierrez and the unidentified gunman then left.

Defendant remained behind. He stepped over Koger's prone body and took a wallet out of Koger's pocket. Then, one by one, he stole property, generally wallets, from other patrons at gunpoint, placing it into a small plastic garbage bag. He took $1,500 from Norwood Square. When he finished, he too left the bar. As he was leaving, Ratterman heard him say, "Anybody move, you're dead." After defendant left, Urone called the police.

Carmen Maria Horton testified after being granted immunity that as of January 1984, she had known Gutierrez a long time and defendant a few months. The night of the robbery, she saw both defendant and Gutierrez in her motel room in Richmond. Defendant told her that they went to the bar to "rob" it. He said he shot the victim, and showed her the gun he used. Horton later sold the gun. Gutierrez and Horton were together in a motel room when Gutierrez was arrested.

Paul Urone, the bartender, worked with the police to prepare an "Identi-Kit" composite of the suspects, and later helped a police artist sketch them. He made no selection from a photographic lineup that did not include either Gutierrez or defendant. About a month after the crime, Urone selected Gutierrez's photograph from a lineup as that of the gunman wearing the

baseball cap. A few days later, he chose defendant's photograph as that of the "shooter." The next day, he identified defendant from a physical lineup. He put a question mark on the card because, he explained at trial, "I just felt that at the time, the seriousness of the crime, I didn't know, he might have had a look alike, a twin, so I just put a question mark . . . ." Urone later attended another physical lineup that included Gutierrez. He initially identified a person other than Gutierrez, but then felt he had made a mistake, and changed his identification to Gutierrez. He identified both Gutierrez and defendant at trial.

Julie Gray told police that one photograph in a lineup that did not include Gutierrez or defendant resembled, but was not, the shooter. Later she identified defendant from a physical lineup as the one who shot Koger. She placed an "X" and a question mark by her identification, the latter because defendant wore a hearing aid at the lineup and his hair appeared darker at the time of the shooting. She also placed a question mark by another person (not one of the suspects) as similar to the gunman with the baseball cap. Later she identified Gutierrez from another lineup. She also identified defendant and Gutierrez at trial.

Verna Ratterman, who was a security manager at the time of the crime, helped the police prepare the artist's sketch of the suspects. At the first physical lineup that included defendant, all the suspects wore hats. Because of this, Ratterman assumed they were looking for the gunman who wore a hat, not the shooter. She chose a person other than defendant with an "X" and a question mark as looking like Gutierrez. Later, she positively identified Gutierrez from another lineup. She identified Gutierrez and defendant at trial.

Norwood Square could not identify anyone at trial, but his memory had been adversely affected by illness and surgery that postdated the robbery. He attended a physical lineup that included defendant, and placed question marks by two positions, including that of defendant. Right after the lineup, he made the following statement to the police explaining his selections: "I'm 95 percent sure that number four [defendant] in the lineup was the one of the two robbers that I saw at The Gilman Street Exit and possibly the one that got my wallet. In parenthesis, not sure. This is based on his facial features, coloring of his hair, his physical size, but particularly his face. [¶] I placed a question mark on number three because he appeared to be the right size and complexion for one of the robbers, possibly the one with the hat. He had the same general demeanor. His face seemed similar, but I am less certain about him being one of the robbers than I am about number four."

No one else in the bar the night of the robbery identified either defendant or Gutierrez.

Berkeley Police Officer Alec Boga investigated the crime. At one point a warrant had issued for the arrest of Gutierrez, but the police did not know who the other two gunmen were. While searching for Gutierrez, Officer Boga spoke with defendant at a home in Richmond. Defendant said he had met Gutierrez about a month earlier and had helped bail "him out of the Martinez jail." During the interview, Officer Boga noticed a black holster. Defendant said "the holster was his, but he no longer owned the gun." After defendant's arrest, and possessing a search warrant, Officer Boga searched a car parked in front of a residence where defendant said he stayed part of the time. Horton testified the car belonged to defendant. Inside the car, Officer Boga found a white plastic garbage bag.

### 2. Defense Evidence

Counsel for defendant elicited on cross-examination of Horton that defendant told her he did not intend to shoot the person at the bar during the robbery; the shooting was an accident.

Defendant called two witnesses. Jean Lipari viewed the lineup that included defendant. She placed question marks after the numbers of two of the subjects, neither of them defendant. She testified that she "didn't put a X on anybody because I wasn't sure and they said if there was anybody who looked something like them, you thought it reminded you of him, to put a question mark on them." During the robbery, she saw only the hand of one of the persons with a weapon.

Carol Mickey testified that she had lived with Koger from time to time. Koger often got into bar fights. When he drank, Koger would "get mad or angry at the slightest little thing. He misinterpreted somebody's talking with him and punch him out."

The codefendant, Gutierrez, also called several witnesses, including David McGuire, who testified among other things that he was with defendant at a Mexican restaurant at the time of the robbery, and Dr. Elizabeth Loftus, who testified about factors affecting the reliability of eyewitness identifications.

### B. Penalty Phase

James Peters testified for the prosecution that in 1961, defendant and another person robbed him at gunpoint while he worked as a gas station attendant in Berkeley. The prosecution introduced records showing that defendant was convicted of robbing Peters and that defendant was also convicted of another armed robbery in 1968.

The defense called four witnesses. Sharon Freeman, defendant's former wife, introduced their two daughters to the jury. Mary Freeman, defendant's mother, identified some paintings by defendant. He was trying to make a living by painting, and had business cards labeled "Freeman's Art Studio." In 1979, defendant received a certificate and a trophy for taking a "mechanics course." Defendant was born in 1939, the second of seven children.

Alta Ruark, defendant's sister, testified that their father had voiced doubts about defendant's parentage. When defendant was about five or six years old, their house was damaged by fire, and they lived with an uncle and aunt for awhile. Once the uncle beat defendant and Ruark for eating a lemon pie. Defendant's father often beat defendant with a belt and once forced him to stand on one leg for an hour. Defendant has difficulty hearing, as do other members of the family. Defendant lived in a foster home for about three years beginning when he was about twelve years old. He was once hit in the ear with a stick, requiring surgery.

Alan Glasscoe, the director of the Berkeley Chess Club, testified that defendant used to play chess at the club. At the time of trial, defendant's name appeared on the mailing list of the California Chess Journal. Defendant once wrote Glasscoe a letter asking about playing correspondence chess.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Defendant's Hearing*

Defendant contends he is "functionally deaf," and that this "impairment compromised his right to participate in his defense and to hear and be personally present at all stages of the proceedings." As the record does not support the contention, we disagree.

#### (a) *The Record*

In August 1984, near the end of the preliminary hearing, defense counsel Spencer Strellis, one of the defense attorneys who represented defendant throughout the trial, stated, "I have heard from my client . . . that his hearing aid batteries, the batteries in his hearing aid have died, and I wonder if the Court would order the sheriff to provide him with new batteries so he *once again* can hear and partake in whatever." (Italics added.) The court responded, "Can I do that through a [Penal Code section] 4011.5?" An off-the-record discussion ensued, and the matter was not again referred to at the preliminary hearing.

On October 31, 1984, at a hearing in superior court, Strellis stated that defendant "has a severe hearing problem," and, although defendant had been provided with a hearing aid, he needed a new battery. "Otherwise," counsel stated, "he is in a position where he cannot hear the judicial proceedings and I think he has a Constitutional Right to hear them." The court agreed and ordered a new battery for defendant.

The question next arose on April 19, 1985, during another hearing in superior court. A different attorney representing defendant stated that defendant "has a hearing problem" and requested batteries. The court noted the problem, and stated a belief that defendant simply had to ask for batteries. The problem was apparently not resolved that easily, for it came up again at a hearing a week later, on April 26, 1985. Strellis stated that defendant had not gotten a new battery in the last two weeks, and that when defendant does not have a battery for his hearing aid, "he is unable to confer with counsel and it reaches Constitutional dimensions." The court stated that they "should buy a supply of batteries," and ordered the bailiff to "check that out."

At the beginning of a hearing on May 16, 1985, the bailiff told the court, "He can't hear." The court asked defendant, "You can't hear me, Mr. Freeman?" Defendant responded, "I can hear you now." During the short hearing, defendant responded to questions posed by the court, and nothing more appears in the record of that hearing relevant to defendant's hearing.

On August 22, 1985, the superior court issued a written order, "Defendant to be taken to the hearing clinic or be provided with batteries."

Despite periodic hearings in court, the record reflects no further problems about defendant's hearing until October 1986. During that time, on May 16, 1986, defendant filed three pro se lawsuits in federal court, all of which were subsequently dismissed. Pursuant to defendant's request, we have judicially noticed those records. In the pleadings, defendant voiced numerous and detailed complaints about his representation and his treatment by the authorities. The only reference to hearing difficulties in any of the pleadings is this statement in the middle of a lengthy complaint about his treatment in jail: "Defendants [i.e., the ones sued in the pro se lawsuit] deny pre-trial detainees the opportunity to personally consult with their attorneys in private at North County Jail, and I have a hearing problem and everybody else can hear my lawyer before I can."

During this time, defendant filed various pro se pleadings in state court complaining about his attorneys and other matters. One, filed October 14, 1986, contained detailed complaints about defendant's medical and dental care. None mentioned a hearing problem.

On October 24, 1986, defendant signed a declaration in which he stated, "I am deaf and have grave difficulty hearing. It is important that I hear in order to confer with my counsel. I would like to see an ear specialist to remove the build up of wax in my ear, because at the present time I am not able to confer and participate in my own defense." This was attached to a "motion for medical treatment" filed on November 14, 1986, by Strellis. Among other things, the motion requested defendant be provided with an "Ear, Nose and Throat specialist."

On November 26, 1986, the court ordered defendant referred for medical examination and treatment for "Eye ear nose & throat (teeth) also for Hearing problem." Defendant received treatment that day and was "sent to Ear-Nose-Throat specialist for audiogram to place hearing aid in right ear." The medical notes indicate defendant already had a hearing aid in his left ear.

In December 1986, the case was assigned for trial to Judge Golde. At the first hearing before Judge Golde, on December 15, 1986, Strellis stated he could not "even talk to my client, and he can't hear what we're saying." The court ordered batteries for defendant's hearing aid. On January 15, 1987, a hearing was held on a peremptory challenge to Judge Golde that defendant filed pro se. Strellis stated the defense wished to withdraw the challenge. Defendant personally agreed. When the court indicated it would grant the challenge unless it was withdrawn, defendant personally stated, "Yes I would like to withdraw it, please." The same day, defendant moved for medical treatment. The court signed an order requiring that defendant be transported to Highland Hospital, "where he shall be seen by an ear doctor; first to have his ears cleaned and secondly to determine whether a second hearing aid would be helpful in allowing Mr. Freeman to hear."

On January 21, 1987, the court asked if "They take care of the doctor?" Defendant personally stated, "Not yet." The court ordered the bailiff to "see this guy gets to the doctor for that ear examination." They discussed how best to proceed. When asked what had to be done for his ears, defendant personally responded, "Clean them, and they have to fit it for hearing on this ear here." At one point the court stated, "I'll go with you to the doctor."

The next day, January 22, the court postponed a hearing from the next Monday to Tuesday so defendant could receive his medical treatment. It ordered that "defendant be seen by an Otolaryngologist for his ears. Further Court orders that his ears be cleaned and a determination be made whether defendant needs a second hearing aid for right ear and that the hearing aid for the left ear be checked and have batteries replaced, if necessary." The

same day, a doctor from the Alameda County Health Care Services examined defendant and scheduled him for an appointment the next day. A notation on the paper work indicates the doctor spoke with Judge Golde.

On January 23, 1987, defendant signed a declaration stating, "My hearing is impaired in both ears. I used to wear two hearing-aids. My hearing is even worse than it was then, 1983, while living in Las Vegas, Nev. My hearing-aid for my right ear went out. I was never able to replace it." The problem had apparently not been resolved by January 27, and Strellis requested another order. The next day, January 28, the court issued a written order that defendant be transferred to a hospital by the morning of January 30 for a "hearing test" conducted by a specified person in a specified room. "If it is determined," the order continued, "as a result of these tests, that Mr. Freeman needs a hearing aid, the appointment for the next step should be made on Monday, February 2nd or Friday, February 6th, and the sheriff shall report back to Department 9 of Alameda County Superior Court on Monday, February 2nd, the date of the next appointment."

Pretrial hearings motions were also heard on January 28. At one point, Strellis stated, "We're going to have a daily on this; is that correct?" The court shook its head. It then said, "You can have a daily on the trial." An unreported bench conference followed at Strellis's request. Immediately after the conference, Strellis stated: "For the record, Your Honor, the discussion we just had, the Court Reporter will create a transcript, not on a daily at this stage, though, later. [¶] If we can have one extra copy of that made so I can give it to Mr. Freeman because of his hearing problem. We will at least let him read and make sure that he heard what was going on." The court ordered the extra copy. The settled statement for the unreported conference states that this "conference related to the defendant's hearing problem. Previously, the Court had ordered that he be fitted with two hearing aids. Because of continuing auditory problems, the Court ordered that Mr. Freeman be provided with a daily transcript."

After the bench conference on January 28, defendant stated he could hear the district attorney but not the particular witness. Strellis suggested the witness speak louder, and the bailiff apparently adjusted the microphone. The hearing continued with no further hearing difficulties apparent from the record. Prior to adjourning, the court stated it needed the defendants the following Monday, and said to "make sure the hearing thing came through." Strellis stated they would only have the test on Friday, so it would not "come through," but thought that by Monday they would know if he had had the test.

At a hearing on February 3, 1987, defendant personally admitted three prior convictions and denied one, with no apparent difficulty understanding the court.

.

At the end of the court day on February 5, 1987, Strellis stated that defendant's "batteries are run down" and requested new ones. Defendant personally expressed difficulty obtaining them. An off-the-record discussion ensued. The settled record states, "The defendant was having continued difficulty hearing all of the proceedings. It was assumed that this was because of the batteries in his two hearing aids. In an effort to rectify this, the Court directed the bailiff to maintain extra hearing aid batteries in his courtroom desk drawer."

During jury selection, on February 9 and March 12, 1987, the court twice issued written orders for defendant to be transported for appointments, the first "for the fitting of a hearing aid," and the second "to get his hearing aid adjusted." At one point near the end of the day on February 24, 1987, the court commented outside the presence of prospective jurors, "Even Freeman heard that, Quatman." Defendant responded, "I heard that." During trial, defendant filed additional pro se pleadings in the superior court and federal court voicing many complaints, none related to his hearing. One time, shortly before the penalty phase, defendant personally stated in court that he wanted the transcript of the day's proceeding. It appeared he generally did not receive the daily transcripts for at least a day.

Nothing more relating to defendant's hearing appears on the trial record.

Long after trial, during hearings to settle the record and to determine whether there had been unreported discussions relating to defendant's hearing, Strellis stated he "would be the last one to say that [defendant] could hear all the proceedings." The district attorney said defendant "got a daily, so he wouldn't miss out on what had gone on." Strellis added, "We got a hearing aid. I replaced the batteries every time he needed them, and we had his ears cleaned. [¶] To answer your precise question, I was fairly careful I think to put on record everything that related to his hearing because it was an ongoing struggle as to who was going to pay for batteries and things like that." The court said, "Everything is on the record because we were not getting an enormous amount of cooperation from the sheriff," and that, "There are no chamber conversations other than just kidding around."

At a hearing to settle the record of the unreported bench conference of January 28, 1987, the court stated, "The conference concerned obtaining an extra copy of the daily transcripts for Mr. Freeman, who had a hearing loss, and we felt it would be necessary to make certain he could comprehend exactly what was said in case he had some difficulty hearing the voir dire of prospective jurors . . . and testimony of witnesses." The court and Strellis also agreed that the daily transcript had been provided because of a concern that defendant "might not be able to hear because of his hearing loss."

In discussing the availability of medical records of defendant's treatment, the court stated, "There is no medical record. . . . All they do is fill out like a half sheet of paper saying cleaned his ears, malingering, didn't do anything, did do something. It's a form . . . kind of like a printed form." Strellis said, "The problem is they don't always send a form. They may have flushed his ears and sent him back a verbal message, we don't think two hearing aids will be better than one . . . ." The court added, "As a practical matter . . . they test, they examine, the guy cleans his ears, and they tell you. They don't give him a—that good a test. It's not very good medical service. You only get that which they did. I'd be shocked if they gave them a test. [¶] But it's possible."

(b) *Analysis*

■■■■■ Defendant contends that although he was physically present during trial and pretrial proceedings, he was effectively not present because he could not hear what was going on and therefore could not participate.

A similar contention was presented in *People* v. *Guillory* (1960) 178 Cal.App.2d 854 [3 Cal.Rptr. 415, 80 A.L.R.2d 1077]. There, on the day of trial, the defendant, who had been released from custody on bail, complained he could not hear what was being said. He did not bring a battery for his hearing aid. At defense request, the court allowed defendant to stand next to the witness to hear. At the afternoon session, defendant indicated he had a hearing aid and could hear some things and not hear others. The trial proceeded. "No objection was made to proceeding further or effort made to change the seating arrangements in any manner. Nor did defendant appear to have any difficulty in following the proceedings." (*Id.* at p. 859.)

The Court of Appeal recognized that the trial court "should afford to a defendant who is handicapped by deafness, blindness or other affliction, such reasonable facilities for confronting and cross-examining the witnesses as the circumstances will permit." (*People* v. *Guillory*, *supra*, 178 Cal.App.2d at p. 861.) We agree. Indeed, the Legislature has taken steps to protect the deaf or hearing impaired. (Evid. Code, § 754; Civ. Code, § 54.8.)[1]

Nevertheless, the *Guillory* court held that the "record does not support the claim [that defendant was denied due process because he could not hear] factually or legally." (*People* v. *Guillory*, *supra*, 178 Cal.App.2d at p. 858.) "The trial judge showed the appellant every reasonable consideration. No

---

[1]Civil Code section 54.8, which provides for the use in specified circumstances of assistive listening systems, was not enacted until after the trial of this case.

objection to the adopted procedure was made in the trial court. When equipped with his hearing aid appellant seems to have had no difficulty in following what was said. When he came to court without live batteries in the hearing device any handicap he may have suffered was self-imposed, and hence gave no ground for complaint. The record leaves no doubt that defendant had a fair and considerate trial and that he is guilty beyond a peradventure." (*Id.* at p. 862.)

The record here also does not support defendant's contention. It shows, indeed, that defendant had hearing difficulties, and that not all attempts to solve them were immediately successful. But it also shows that defense counsel and the court were solicitous of the problem, and took repeated steps to resolve it. The court ordered medical treatment when and as defendant requested. If multiple orders were needed, the court issued them. When defendant needed new batteries for his hearing aids, the court made sure he got them. In light of the repeated motions and requests regarding defendant's hearing up to that point, by counsel and defendant personally, which consistently met with action by the court, defendant's silence thereafter is significant. Moreover, except for a few scattered early occasions, whenever defendant was spoken to he responded with no apparent hearing difficulty. To the extent defendant argues his counsel acted incompetently regarding his hearing difficulties, the record similarly does not support the contention.

Defendant argues that providing a daily transcript to defendant was not a sufficient remedy, and that a "qualified interpreter" or "preferable visual substitutes, such as real-time transcription or CAT (computer assisted transcription)," should have been provided. However, no such action was requested; nor does the record demonstrate it was necessary. As Strellis stated when the court ordered the daily transcript, the purpose was to "make sure that he heard what was going on." The transcript *augmented* other steps taken to ease the problem, and supplemented defendant's own ability to hear; it was never intended to be a remedy for a defendant who could hear nothing.

Even if we assume that defendant occasionally failed to hear something, there is no reason to further assume that anything of significance was missed, or that defendant's ability effectively to participate in the proceedings or assist his attorney was compromised. ■ Even total physical absence from a hearing is not reversible unless the defendant's presence bears a reasonably substantial relation to the fullness of the defendant's opportunity to defend against the charges. (*People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282].) ■ Nothing in the record indicates that the hearing difficulties adversely affected the

defense, or prejudiced defendant in any way. Because he fails to demonstrate how he was prejudiced or denied a fair trial, we reject his claim of constitutional error. (*Id.* at p. 903.)

### 2. *"Marsden" Claim*

On August 7, 1986, a few months before the case was assigned to Judge Golde for trial, defendant filed one of his several pro se pleadings, a "Petition for Writ of Habeas Corpus," on a standard form approved by the Judicial Council. Defendant stated the following grounds upon which he based his allegation that his "imprisonment or detention is illegal": "I have a [*sic*] attorney I do not trust and conflict of interest. [¶] My attorney wants me to plead guilty." In response to the form question why he had not previously presented the ground, defendant stated: "I did not know how to get another attorney. See [*Harris* v. *Superior Court* (1977) 19 Cal.3d 786 (140 Cal.Rptr. 318, 567 P.2d 750)]."

On August 13, 1986, without holding a hearing, the superior court issued a minute order denying the petition for writ of habeas corpus because there were "no grounds alleged upon which relief may be granted."

▇▇▇ Defendant contends that the document, although "styled as a petition for writ of habeas corpus," was, "in essence, a 'Marsden motion'" (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), and that the trial court erred in failing to hold a hearing before denying it. We disagree.

▇▇▇ In *People* v. *Marsden, supra,* 2 Cal.3d at page 124, we held that "a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." Because of this, "[w]hen a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel. [Citations.]" (*People* v. *Webster* (1991) 54 Cal.3d 411, 435 [285 Cal.Rptr. 31, 814 P.2d 1273].) "[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 281 [247 Cal.Rptr. 1, 753 P.2d 1052].) "We do not necessarily require

a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney." (*Id.* at p. 281, fn. 8.)

■ The Attorney General argues that the habeas corpus petition was not a *Marsden* motion because it "sought [defendant's] release from confinement, not substitute counsel. If [defendant] had desired the appointment of a new attorney, the record fully demonstrates that he was capable of making that desire known to the court." We need not decide that question, however, for even if we assume that the petition was the equivalent of a *Marsden* motion, the court properly acted upon it without further inquiry.

Defendant did not orally request new counsel in court, but chose instead to file a formal written petition. The form he used permitted him to state all reasons for the relief requested. The question on the form immediately after defendant stated the grounds for his allegations asked defendant to state "the facts which support each of the grounds." Defendant left this question blank, which indicated he was relying on the grounds he had already stated. There was no reason for the trial court to suppose defendant withheld his reasons or supporting facts, or wished to state further examples of counsel's inadequate representation. He certainly did not "offer to relate specific instances of misconduct." (*People* v. *Marsden, supra,* 2 Cal.3d at p. 124.) The petition was a self-contained document.

In *People* v. *Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290], in a prior case, the defendant had "sent a detailed letter to the trial judge explaining why he was unhappy with his trial attorney . . . ." (*Id.* at p. 580.) We found no error in the court's denial of new counsel without further inquiry. "When the basis of a defendant's dissatisfaction with counsel is set forth in a letter of sufficient detail . . . a full-blown hearing is not required." (*Ibid.*)

A full-blown hearing was not required here either. The only reason stated for the lack of "trust" and the "conflict of interest" was that defendant's attorney wanted him to plead guilty. The petition was filed months before trial; defendant did not claim that counsel would be unprepared if the case went to trial, as it eventually did. Defense counsel is obligated to advise the defendant regarding plea offers and possible guilty pleas. In light of this, defendant did not state an adequate basis for substitution of counsel. (*People* v. *Smith* (1993) 6 Cal.4th 684, 689, 696-697 [25 Cal.Rptr.2d 122, 863 P.2d 192]; *People* v. *Terrill* (1979) 98 Cal.App.3d 291, 299-300 [159 Cal.Rptr. 360]; see also *People* v. *Wharton, supra,* 53 Cal.3d at pp. 580-581 [citing *Terrill* with approval].)

*People* v. *Lloyd* (1992) 4 Cal.App.4th 724 [6 Cal.Rptr.2d 105], cited by defendant, is distinguishable. There, the defendant wrote a letter to the

superior court requesting a new attorney. The letter contained specific claims of defense counsel's alleged malfeasance which, if well-founded, may have warranted the appointment of new counsel. The trial court was apparently unaware of the letter, and took no action regarding it. The Court of Appeal found the court erred in not even considering the "*Marsden* motion," although the error was cured by later events. (*Id.* at p. 731-732.)

Here, by contrast, the court *did* consider and deny the petition. Defendant stated neither sufficient grounds for substitution of counsel nor anything requiring further inquiry. There was no error.

### 3. *Jury Selection*

Defendant challenges the jury selection process on several grounds. Each lacks merit.[2]

Defendant's primary complaint is that defense counsel and the prosecutor disclosed to the first panel of prospective jurors that defendant had prior convictions for armed robbery. The issue arose in the following factual context.

Prior to examining the first panel, the court, anticipating that defendant would admit the prior convictions, stated that it would not read the allegations regarding them to the prospective jurors. Thereafter, while "death-qualifying the jury," the court and parties questioned the prospective jurors individually, as mandated in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]. During this individual questioning, defense counsel Strellis often referred to the prior convictions. For example, in questioning the first prospective juror, he asked, "Let us suppose that . . . you were to find that on four prior occasions some other time, years earlier, days earlier, months earlier, Mr. Freeman had been convicted of robbery, based on the fact that you have convicted him of murder, that you've convicted him of nine counts of, I think, attempted robbery, if I'm going to characterize it correctly, and that he has four prior robbery convictions, would you automatically come back with a verdict of death?" The answer was "no."

Later that day, defendant admitted the priors, which actually included two robberies and being an ex-felon in possession of a firearm on the occasion of

---

[2]We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis. (*People* v. *Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

one of the robberies. Starting the next day, the district attorney also sometimes referred to the priors. A few days later, outside the presence of the prospective jurors, counsel for the codefendant Gutierrez, who did not face capital charges, objected that referring to defendant's priors "tainted" Gutierrez with "guilt by association." Strellis responded: ". . . I intend to ask every single juror, unless Mr. Quatman [the district attorney] does it, whether they would automatically return a death penalty based in part on the fact that my client has got two prior robbery convictions for which he has served separate prison terms. [¶] And I think I would be derelict in my duty to him if I did less than that. [¶] I can't do it hypothetically. They're his priors, and the one thing I do not want is for a surprise to the jury in the penalty phase, if we should get there, where suddenly they're evenly balanced, and we throw in two priors they never thought about."

On March 12, 1987, more than a month after the defense began referring to the priors, the court indicated that it would not allow either the defense or the prosecution to mention the priors to the second panel that would be called after the first had been exhausted. In light of this, Strellis moved to withdraw defendant's admission of the priors for the express purpose of placing them at issue so he could question the second panel of jurors about them. The court expressed the view that "in retrospect" it should not have allowed Strellis to question even the first panel about the priors, but took under submission Strellis's motion to withdraw the admission. That afternoon, the court determined that there had not been "a proper voir dire on the priors," and allowed the defense to withdraw their admission. It also allowed defense counsel to ask prospective jurors about the priors if desired, but ordered that the district attorney could prove them only "after the guilt phase is decided," and could not mention them unless the defense did first.

Shortly after this ruling, Strellis advised the court that defendant "just told me as of right now he would prefer there be no mention of the priors." Defendant then again admitted the prior convictions. They were not thereafter mentioned to any prospective jurors. The two prior robbery convictions were mentioned during voir dire of three of the actual jurors.

On April 22, 1987, defendant filed a handwritten pro se motion to dismiss the first jury panel and for a mistrial because the prior robbery convictions were mentioned to the first panel "without defendant's permission." The next day, Gutierrez also moved for a mistrial because defendant's prior convictions were mentioned "without co-defendant's permission." The court denied the motions.

In argument to the jury at the penalty phase, Strellis referred to the prior robberies, and stated they "should have come as no shock to most of you because we talked about it when we were selecting the jury."

■ Defendant argues that "defense counsel and the prosecutor made it impossible for [defendant] to receive a fair trial" by disclosing his prior convictions. In effect, he claims Strellis was ineffective, and the district attorney committed misconduct, in this regard. The claim of misconduct has been waived. Not only did the defense fail to object to the district attorney's reference to the priors but, as noted, defense counsel referred to them first. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 47-48 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Ashmus*, *supra*, 54 Cal.3d at p. 976.)

Defendant has not demonstrated ineffectiveness of counsel. ■ "To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People* v. *Kelly* (1992) 1 Cal.4th 495, 519-520 [3 Cal.Rptr.2d 677, 822 P.2d 385].) "A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*Id.* at p. 520.)

■ Defense counsel Strellis explained his tactical decision on the record. Recognizing the possibility of an eventual penalty phase at which the priors would be proven to the jury, counsel wanted to blunt their effect by educating the jury about them in advance. We have already recognized the validity of such a tactical decision. In *People* v. *Lanphear* (1980) 26 Cal.3d 814, 826-831 [163 Cal.Rptr. 601, 608 P.2d 689], defense counsel failed to object at the guilt phase to evidence of other crimes because he believed the evidence would be admitted at a possible penalty phase. We found such a decision reasonable. "Defense counsel was caught in a cruel dilemma: If the prior murders were introduced for the first time when the jury was considering penalty alone, the impact would be such as to make the penalty of death a foregone conclusion. . . . We cannot say that the trial counsel's actions were not the product of informed tactical choice within the range of reasonable competence." (*Id.* at p. 831, as quoted in *People* v. *Kelly*, *supra*, 1 Cal.4th at p. 522.)

This rationale applies here. Defense counsel had to make a decision; he had to weigh the possible prejudice at the guilt phase of informing the jurors of the priors against the possible prejudice of the jury hearing of them for the first time at the penalty phase. "[C]ounsel may reasonably treat the entire trial as a whole, and consider what effect a tactical decision at one phase will have on a later phase." (*People* v. *Kelly*, *supra*, 1 Cal.4th at p. 522 [counsel reasonably failed to object to the guilt phase admission of a confession that might aid the defense at the penalty phase].) Counsel did so here; he made his decision and acted upon it. He followed through in his penalty phase

argument to the jury. "This is precisely the type of tactical decision defense counsel must be allowed to make without fear of appellate second-guessing ' "in the harsh light of hindsight." ' " (*Id.* at p. 523; see also *People* v. *Visciotti, supra*, 2 Cal.4th at pp. 47-48, fn. 17 [Counsel "may well have believed that this method of acquainting jurors with the evidence they were to hear would blunt its eventual impact."].)

■ Defendant complains that counsel acted without his permission. His permission was not required. "[C]ounsel is captain of the ship. . . . 'When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics.' " (*In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335] [counsel can agree to trial by a commissioner], quoting *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1163 [259 Cal.Rptr. 701, 774 P.2d 730], italics in *Hamilton*.) ■ Once defendant made known to counsel his desire that prospective jurors not be informed of his record, counsel stopped mentioning it. Until then, he was entitled to voir dire the prospective jurors in the manner he felt was best for his client.

■ Defendant also argues that his attorneys were ineffective in their voir dire of the prospective jurors. Specifically, he claims the "defense voir dire examination of *all* prospective jurors on death penalty/capital punishment issues was superficial and lacking in perception." (Italics by defendant). He also claims his attorneys were ineffective in exercising only 15 of 26 joint defense peremptory challenges and none of the individual challenges.

We have repeatedly rejected similar contentions. "Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process." (*People* v. *Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The record reveals nothing suggesting incompetence in the questioning of prospective jurors. Defendant's attorneys participated fully in the process, and did so intelligently; they also had the benefit of the questions posed by the other attorneys and by the court, and the answers to those questions. Counsel asked no questions of some of the prospective jurors, which may be the best tactic for a number of reasons. For example, questioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause. Defendant "has not demonstrated that the manner of conducting this portion of voir dire resulted from other than an informed

strategic decision." (*People* v. *Cox* (1991) 53 Cal.3d 618, 658 [280 Cal.Rptr. 692, 809 P.2d 351]; see also *People* v. *Lewis* (1990) 50 Cal.3d 262, 290 [266 Cal.Rptr. 834, 786 P.2d 892] ["Defendant's assumption that a short voir dire could not have been competent is not supported by the authorities he cites."].)

We also find no incompetence in the exercise of peremptory challenges. "In complaining that counsel should have exercised more peremptory challenges, defendant selects isolated juror responses that do not give the full picture. Our review of the record does not support defendant's claim that counsel acted unreasonably in failing to exercise more peremptory challenges." (*People* v. *Lewis*, *supra*, 50 Cal.3d at p. 290.)

To use a concrete example, defendant is particularly strident in arguing that the defense should have excused one juror who said that he could vote for execution "If it was proper." Defendant complains, "The court did not ask the companion question of 'If you felt it was proper to give life without possibility of parole could you vote for life?' Thus, without presenting the other side of the coin, the court's questions, in general, wrongly focused on the death penalty." Defendant simply ignores the record. Just *before* the portion he cites came these questions and answers:

"[Question by the court]: [I]f you felt that life without possibility of parole was appropriate, *could you vote for life without possibility of parole*?

"[Answer]: Would I?

"[Question] Could you if you felt it was appropriate?

"[Answer]: *Sure.*

"[Question]: If you have felt the death penalty were appropriate, could you vote to impose death?

"[Answer]: *Possibly.*" (Italics added.)

The italicized language suggests the juror might have been good for the defense. The follow-up questioning that defendant focuses exclusively on showed only that the juror, although ambivalent about the death penalty, could vote for it if appropriate. Defendant claims his attorneys were incompetent for not questioning this juror themselves about the death penalty. The reason they did not is apparent. Why take a chance on him saying something that might get him disqualified or cause the district attorney to challenge him peremptorily when his views were established by the other questioning?

Defendant cites selected information about the juror that he claims shows he would favor the prosecution, and argues, "Just how or why a competent lawyer would accept this juror—with 16 challenges remaining—unless he was not listening, escapes us." This is equally meritless. Defense counsel no doubt listened to the juror's tentative answer "possibly" when first asked whether he could vote for death, and the unqualified answer "sure" when asked whether he could vote for life, and no doubt considered *all* the circumstances, not a selected few. In short, competent counsel could reasonably have concluded that a peremptory challenge should not be expended on this juror.

Defendant has also failed to show prejudice. Nothing in the record suggests the actual jury was biased, or that it is reasonably probable a different jury would have been more favorably disposed towards defendant. (*People* v. *Lewis, supra,* 50 Cal.3d at p. 291; see also *People* v. *Cox, supra,* 53 Cal.3d at p. 659; *Singleton* v. *Lockhart* (8th Cir. 1989) 871 F.2d 1395, 1400; *United States* v. *Taylor* (10th Cir. 1987) 832 F.2d 1187, 1195-1196.)

█ Defendant also complains that the "trial court repeatedly risked prejudicing jurors during voir dire by presenting individual jurors with possible scenarios, none of which mentioned that defendant *might* be innocent." (Italics by defendant.) "Defendant's failure to object at trial, however, particularly where (as here) such action would have permitted the court to clarify any possible misunderstanding resulting from the comments, bars his claim of error on appeal." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1053 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

The contention also lacks merit. The court carefully explained to the jury panels that questions regarding the death penalty are relevant only *if* the jury found defendant guilty of murder with special circumstances, and that it was *not* suggesting that the jury would or should make those findings. The conditional nature of the questions regarding death was repeated during the individual voir dire, including the voir dire of the very prospective juror that defendant uses as a "[t]ypical" example supposedly supporting his position. The court told the juror, "*If* you find Mr. Freeman guilty of first degree murder and you find the special circumstance true, that he intentionally killed during the course of a robbery, the law says the punishment for that offense is either death or life without possibility of parole. . . ." (Italics added.) Defendant purports to quote this language, but deletes the critical word "If."[3]

---

[3]In a letter dated and filed five days before oral argument, defendant argued for the first time that "the trial court unconstitutionally excluded prospective jurors based on their

#### 4. *Testimony of Witness Horton*

 Carmen Maria Horton testified under a grant of immunity that defendant told her he was the one who shot the victim during the robbery, and that the shooting was an accident. Defendant contends she should not have been allowed to testify without a prior hearing as to her "competency as a witness," and that the prosecution improperly withheld the terms of her immunity.

Defendant did not seek a hearing on Horton's competence, or make any objection or motion relevant to this contention, thus waiving the claim. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1216 [283 Cal.Rptr. 144, 812 P.2d 163].) Moreover, the claim lacks merit. The order granting immunity, issued in 1984 at the time of the preliminary hearing and signed by Judge Golde, was not originally part of the appellate record. The record has now been augmented to include it. It ordered Horton to "answer the questions with respect to her knowledge in" this case, and further ordered unconditionally that she "shall not be prosecuted or subjected to penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the Order, she was required to answer."

Nothing suggests the terms of the grant of immunity were withheld from the defense. No conditions were attached to the grant, and no reason appears to question Horton's competence to testify.

Defendant also claims that the district attorney committed misconduct by "implying to the jury that the judge vouched for [Horton's] credibility." The district attorney concluded his direct examination of Horton as follows: "[Question]: Now, prior to coming to court today back in August the 9th of 1984, you appeared in this courtroom; correct?

"[Answer]: Yes, I did.

---

principled opposition to the death penalty." Although the parties are entitled to file a supplemental brief no later than 10 days before oral argument "confined" to "new matter" that was "not available in time to have been included in the party's brief on the merits" (Cal. Rules of Court, rule 29.3(a)), such a letter is not an appropriate vehicle to raise entirely new issues that could have been raised in the original briefs. For this reason, we deem the issue waived.

Our review of the record and pertinent authorities also convinces us that the belated contention is meritless. (E.g., *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 771-772 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 840-841 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-358 [197 Cal.Rptr. 803, 673 P.2d 680]; *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1.)

"[Question]: And Judge Golde, the judge present here, granted you immunity?

"[Answer]: Yes, he did.

"[Question]: That was requested by the prosecution as to any offenses you may have committed in your involvement in this?

"[Answer]: Yes."

This questioning, defendant contends, was a "bold insinuation to the jury that the trial judge had vouched for Carmen Horton's credibility by granting her immunity" and, as such, was a "foul blow." Again, the claim has been waived by the failure to object. (*People* v. *Ashmus*, *supra*, 54 Cal.3d at p. 976.) Moreover, there was no misconduct. The questions merely informed the jury that Horton had received immunity for her testimony. No reasonable juror would interpret the questions as implying that the judge, or anyone else, had vouched for her credibility. (*People* v. *Price* (1991) 1 Cal.4th 324, 445 [3 Cal.Rptr.2d 106, 821 P.2d 610] ["A reasonable juror would be unlikely to view the statement that immunity was 'not contrary to the public interest' as an endorsement of [the witness's] credibility."].)

Defendant also argues that the terms of the grant of immunity were stated differently in the 1984 written order (Horton "shall not be prosecuted or subject to penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the Order, she was required to answer," i.e., "her knowledge" in this case) and in the direct examination of the witness at trial (immunity "as to any offenses you may have committed in your involvement in this"). Although slightly different language was employed, the substance was the same. Horton was required to testify about her knowledge in the entire case, so, in effect, she was granted immunity as to any offenses she may have committed in the case.

Defendant claims the 1984 order did not grant immunity from prosecution as an "accomplice," while the 1987 formulation would have. We disagree. Horton's compelled testimony implicated her as an accessory under Penal Code section 32, although not as a principal; that "fact or act" was clearly covered by the 1984 order. Moreover, even if, hypothetically, the prosecutor had stated the terms of immunity more broadly in front of the jury than in the written order, that would not aid defendant. Both formulations granted unconditional immunity; neither suggests any reason to doubt Horton's competence to testify. In addition, the broader the grant of immunity the greater tendency it has to cast doubt on the credibility of the witness.

Defendant argues that Horton refused to testify at the preliminary hearing, and that before trial, the prosecutor expressed doubts that she would testify at all. This is correct, but again does not suggest in the slightest she was incompetent when she did testify. He also argues the prosecutor said, "I will alert this Court ahead of time if she's coming and any possible problems." Although there was no "alert" on the record before she testified, this may merely mean there were no problems. There is no showing Horton was incompetent to testify, or that the prosecutor committed any form of misconduct.

Defendant finally argues his attorneys were incompetent in not asking for a competency hearing and in their limited cross-examination of the witness. There is no reason apparent in the record for counsel to have requested a hearing on Horton's competence. Moreover, as discussed below regarding counsel's alleged "concession of guilt," defense counsel had difficult tactical decisions to make as a result of Horton's testimony. The cross-examination was brief, and limited to eliciting evidence that defendant told Horton the shooting was an accident, testimony obviously beneficial to the defense. Counsel left it to counsel for the codefendant to cross-examine Horton on questions of credibility. We see no incompetence.

## 5. *Evidence of the Plastic Bag*

 Two of the eyewitnesses, Urone and Ratterman, testified that defendant placed the property he stole from the robbery victims into a "plastic small garbage bag" (Urone) or a "[w]hite plastic garbage bag" (Ratterman). Without objection, Officer Boga testified that he found a "white plastic garbage bag" in a car Horton said belonged to defendant. Strellis elicited on cross-examination testimony that the Berkeley Police Department had lost the bag. It should have been placed in the "central property room" but Officer Boga could not locate it.

Implicitly recognizing that because there was no objection to the testimony about the bag, he cannot directly challenge its admission (Evid. Code, § 353, subd. (a)), defendant contends the district attorney committed misconduct by eliciting the evidence, his attorneys were ineffective in not objecting, and the trial court should have stricken the testimony on its own motion. The claim of misconduct has been waived by the failure to object. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 976.) The trial court also has no sua sponte duty to exclude evidence or to remedy misconduct. (*People* v. *Montiel, supra,* 5 Cal.4th at p. 918.)

We also find no misconduct and no incompetence. Because the decision whether to object is inherently tactical, the failure to object to evidence will

seldom establish incompetence. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].) Defendant claims the evidence of the bag in the car was irrelevant because no one identified it as the bag used in the robbery, and an "infinite" number of people "must possess such common, unremarkable articles as plastic bags" in their cars. We disagree.

██ Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. [Citation.] Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury." (*People* v. *Slocum* (1975) 52 Cal.App.3d 867, 891 [125 Cal.Rptr. 442].) ██ Evidence that defendant possessed a plastic garbage bag shortly after the crime, coupled with the evidence that the shooter in the bar used a plastic garbage bag, tended to show that defendant was the shooter, which is a material fact in the case. Standing alone the inference may have been weak, but that does not make the evidence irrelevant. The fact that many persons may similarly have possessed such bags may diminish the strength of the evidence, but it does not make it irrelevant.

In *People* v. *De La Plane* (1979) 88 Cal.App.3d 223 [151 Cal.Rptr. 843], the court admitted over a relevance objection evidence of a sawed-off axe handle found in the bathroom of the house in which the defendant was arrested. No evidence connected the handle to the crimes of that case except for expert testimony that it "*could* have caused" the victim's wounds. (*Id.* at p. 239, italics in original.) The Court of Appeal upheld admission of the evidence: "If a victim's wound *could* have been caused by a specific type of weapon or instrument, such a weapon or instrument found in defendant's possession is admissible in evidence. Such a weapon or instrument is considered relevant on the theory that a trier of fact may reasonably draw an inference from defendant's possession of the weapon or instrument to the fact that he used the weapon or instrument to commit the offense—a disputed fact of consequence in the action." (*Ibid.*, italics in original.)

Similarly, here the jury may reasonably infer that defendant used the bag in the robbery, and thus was the shooter, a disputed fact of consequence in the action. Contrary to defendant's contention, the inference was not speculative, but was based on the similarity of the bag used in the robbery to the one found in defendant's car. In *People* v. *De La Plane, supra,* 88

Cal.App.3d at page 240, the appellate court suggested the trial court could have excluded the evidence of the axe handle under Evidence Code section 352 because of its prejudicial nature. Here, there was nothing prejudicial about the plastic bag. No reason appears to have excluded it.

Defendant assumes Strellis was unaware the bag had been lost before his cross-examination of Officer Boga, and therefore that he had not adequately investigated the facts. Nothing in the record supports such an assumption. On the contrary, Strellis's focused cross-examination suggests that he knew the situation exactly, and carefully elicited precisely the testimony he wanted in an attempt to discredit the investigation into this crime.

 Defendant argues the evidence should have been excluded, or sanctions should have been imposed, because the bag was later lost. In order to obtain sanctions for the loss of evidence, the defendant must show that it possessed an exculpatory value that was apparent before it was destroyed, and that the police acted in bad faith. (*People* v. *Webb* (1993) 6 Cal.4th 494, 519 [24 Cal.Rptr.2d 779, 862 P.2d 779].) Defendant can show neither. It is hard to imagine how the bag could have had an *exculpatory* value or how that value could have been apparent to the police. There is also no suggestion of bad faith. The jury heard all the facts surrounding the bag and its loss, and could draw its own conclusions. That was sufficient to protect defendant. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 811-812 [281 Cal.Rptr. 90, 809 P.2d 865].)

Defendant also suggests the issue regarding the bag was somehow related to an earlier "*Hitch*" motion (*People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]) defendant made pro se, and argues that his attorneys acted ineffectively regarding that motion. The motion, handwritten by defendant, was labeled "Notice of motion and motion to dismiss (Hitch motion)," and requested the charges be dismissed "based upon the suppression and/or failure to preserve evidence." The motion was couched entirely in general terms; it never specified what evidence was supposed to have been suppressed or not preserved, and does not mention the plastic bag. The closest the motion came to being specific was a statement that the prosecutor "must provide names of all informants." When the motion was first filed, Strellis had not yet read it. As he stated, "It's in pro per. I'm not entitled not to file the motion." He asked to put the motion over so he would be in a position to argue it. When the motion was considered on the merits, Strellis stated in general terms that defendant was only asking for what he was entitled to, that the district attorney provide him with all exonerating evidence. The district attorney stated there was none that had not already been provided. When the defense presented no evidence to the contrary, the motion to dismiss was denied.

The court properly denied the motion. Defendant made no showing what-soever that any evidence had been withheld, and did not even specify what he was complaining about. As the trial court noted, it appeared the motion was copied from a form book. Defense counsel was not incompetent in not pursuing the motion more vigorously.

### 6. Other Crime Evidence

During the defense portion of trial, codefendant Gutierrez called as a witness David McGuire. McGuire supplied an alibi for *defendant*.[4] On cross-examination, the district attorney elicited that McGuire had two prior felony convictions, including a robbery committed in California in 1961. McGuire testified that he knew defendant in 1961, and had a "special relationship" with him at that time. The district attorney then asked, "Did you have another individual on that armed robbery with you in 1961?" Defendant objected. The court initially sustained the objection, but then there was an unreported bench conference. According to the settled statement, the court ruled that the testimony regarding the " 'special relationship' " was admissible "based on the fact that he had been called by the defense as an alibi witness and that the nature of their prior relationship was a proper question evidencing bias and interest." At the hearing to settle the record, the court also indicated it said it "would instruct the jury it goes to the question of bias, interest, or motive of the witness."

The district attorney elicited testimony that defendant was the "co-defendant" in the 1961 robbery. He then asked, "Now, during the course of that particular event you were armed with a firearm, were you not?" Defendant objected that the district attorney "has no right to go into the underlying facts of that." The objection was sustained, and the matter was not pursued.

Later, outside the presence of the jury, defendant moved for a mistrial on the basis that the "District Attorney had no right to go into the specifics of whether or not it was an armed robbery or guns were used." The court responded, "He didn't. He asked him was there a gun used, you objected, I sustained. [¶] Going into the robbery to show he was a crime partner is perfectly proper when it's offered as an alibi." When counsel for defendant noted the witness was not called by defendant, the court responded, "What difference does it make? He testified."

---

[4]Defendant claims not to "know, what strategy, if any, motivated the calling of McGuire as a witness," and even argues that counsel for the codefendant committed misconduct. On the contrary, the strategy is readily apparent. The evidence of identity was quite similar as to both defendants. Generally, those witnesses who identified one identified both. Horton implicated both. Thus, counsel for Gutierrez could reasonably conclude that evidence casting doubt on the identity of either defendant effectively cast doubt on both. There was a sound reason for Gutierrez to call McGuire.

■ Defendant argues: (1) the court erred in allowing evidence regarding the 1961 robbery; (2) the court should have given a limiting instruction; (3) the district attorney committed misconduct during the cross-examination and in the later argument to the jury; and (4) in light of McGuire's testimony, the court should have granted an earlier severance motion. Sprinkled throughout are related claims of ineffective assistance of counsel. All contentions lack merit.

Evidence that the alibi witness and defendant were crime partners in 1961 was admissible on the question of credibility. "The existence or nonexistence of a bias, interest, or other motive" may be considered in judging the credibility of a witness. (Evid. Code, § 780, subd. (f).) The evidence was admitted for that purpose, and therefore did not violate the general proscription in Evidence Code section 1101, subdivision (a), against the use of other crimes evidence. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1017 [264 Cal.Rptr. 386, 782 P.2d 627].)

Defendant argues that there was other evidence of bias, mainly that he and McGuire celebrated McGuire's birthday together the night of the robbery in this case. Therefore, he argues, evidence of the earlier robbery was merely cumulative, and should have been excluded under Evidence Code section 352. However, evidence that the witness and defendant had known each other at least since 1961, and had been partners in crime, was far more probative to show the witness might be willing to perjure himself to aid defendant than the mere fact they celebrated a birthday together. The evidence was properly admitted.

Defendant cites *People* v. *Holt* (1984) 37 Cal.3d 436 [208 Cal.Rptr. 547, 690 P.2d 1207], where the trial court admitted evidence of gang membership of certain witnesses. Although recognizing that a "witness may be cross-examined about the group membership he shares with a party to the action" to show bias, we doubted whether the evidence was properly admitted in that case because there was no evidence the defendant belonged to any such gang. (*Id.* at p. 456.) Here, the evidence *did* link the witness and defendant.

Defendant also contends the court failed to expressly weigh the probative value against the prejudicial effect. (See *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) "[H]owever, the record does not show an objection on these grounds to this line of questioning. [Fn. omitted.] Accordingly, the trial court was not obligated to make such an explicit ruling." (*People* v. *Fierro* (1991) 1 Cal.4th 173, 238 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Moreover, the fact the court disallowed questions regarding the specific facts of the 1961 crime suggests the court did weigh the probative

value against the prejudicial effect. Given the importance of allowing evidence that shows bias (*People* v. *Dyer* (1988) 45 Cal.3d 26, 47 [246 Cal.Rptr. 209, 753 P.2d 1]), the court's rulings were well within its discretion.

■ Although the court apparently offered to instruct the jury on the purpose for which it could consider this evidence, it never did. Defendant did not, however, request such an instruction, which waives the issue. The court has no sua sponte duty to so instruct. (*People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]; *People* v. *Milner* (1988) 45 Cal.3d 227, 251-252 [246 Cal.Rptr. 713, 753 P.2d 669].) Nor was counsel ineffective in failing to request the instruction. Counsel may well not have desired the court to emphasize the evidence, especially since it was obvious for what purpose it was being admitted. (See *People* v. *Collie, supra,* 30 Cal.3d at p. 64 ["Evidence of past offenses may not improperly affect the jury's deliberations if . . . the evidence is obviously used to effect one or more of the many legitimate purposes for which it can be introduced."].)

■ Defendant contends the prosecutor committed misconduct by asking whether McGuire was armed with a firearm. The court sustained an objection to the question, and it was not pursued. Defendant did not ask the jury be admonished to disregard the question, which, in any event, referred only to McGuire and not defendant. The issue has thus been waived. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 319 [261 Cal.Rptr. 348, 777 P.2d 121].) The court instructed the jury at the conclusion of the guilt phase that as "to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection." (See *ibid.*) Moreover, merely asking a question to which an objection is sustained does not itself show misconduct. Since the objection was sustained, counsel may have felt it best not to emphasize the matter in front of the jury. His failure to request a specific admonition was therefore not incompetent. (*People* v. *Ghent, supra,* 43 Cal.3d at pp. 772-773.)

Defendant also contends the prosecutor committed misconduct in suggesting to the jury during argument that McGuire may have been the unapprehended third man. Other prosecution evidence indicated that the identity of this third person was unknown. There was no objection, however, thus waiving the claim. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 976.) In any event, the argument merely commented on the evidence, and came within the broad range of permissible argument. The jury could decide the matter for itself. There was no implication the prosecutor had information not available to the jury. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 839.)

■■■ Defendant argues that because of McGuire's testimony, the court should have granted his pretrial motion to sever his trial from that of the codefendant. The motion, which was denied, was based upon nonspecific grounds that had nothing to do with McGuire's testimony. Since the correctness of a ruling on a severance motion must be judged on the facts known and the showing made at the time of the motion, McGuire's later testimony is irrelevant to the ruling. (*People* v. *Mitcham*, *supra*, 1 Cal.4th at pp. 1048-1049.)

Defense counsel was also not incompetent for failing to renew the severance motion. As discussed in the next part, by this stage of the trial, defense counsel may have believed that the codefendant was useful to defendant in carrying the burden of trying to raise a reasonable doubt regarding identity, allowing counsel for defendant to concentrate on the issue of intent to kill. Moreover, given the Legislature's preference for joint trial of jointly charged defendants, and the advantages of such a trial, McGuire's testimony alone would not have been sufficient to justify severance of an otherwise proper joint trial. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 499-501 [250 Cal.Rptr. 550, 758 P.2d 1081].)

### 7. *Defense Counsel's Alleged "Concession of Guilt"*

■■■ In his opening statement to the jury, counsel for defendant suggested that the identity of the robbers as well as intent to kill on the part of the gunman would be issues at trial.[5] During the evidence portion of the guilt phase, counsel cross-examined witnesses and presented one defense witness on identity. After all the evidence had been presented, however, and it came time to argue the case, counsel Strellis discussed solely the question of intent to kill. He did not expressly concede defendant's identity as the gunman, and in discussing the gunman he referred, not to defendant, but to the "accused robber." But he never argued that defendant was not the gunman, and he phrased the issue as whether defendant intended to kill. Counsel for the codefendant argued extensively the question of identity, attacking the eyewitness identifications and the credibility of witness Horton.

Defendant contends that his attorney's "concession" of guilt was tantamount to a guilty plea requiring a knowing and voluntary waiver of

[5]The crime was committed, and the trial held, after our decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and before *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. Therefore, to find the special circumstance true, as the jury did, it had to find that defendant intended to kill Koger. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131].) The court so instructed the jury. Thus, counsel knew they could avoid a penalty phase, and a death verdict, if they could convince the jury that defendant did not intend to kill Koger.

constitutional rights, and that counsel failed to provide effective representation in this regard. We disagree on both counts.

Citing *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], defendant argues that he had to be admonished of and personally waive his rights against self-incrimination, to a jury trial, and to confront adverse witnesses before counsel could "concede" his guilt of everything but the special circumstance. Counsel did not, however, concede guilt; he merely did not argue the question of identity. The jury still had to find defendant was the gunman beyond a reasonable doubt. But even if counsel had expressly conceded identity, admonitions and waivers would not have been necessary.

In *People* v. *Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350], defense counsel presented no closing argument at all. Pointing out that defendant *did* receive a jury trial, exercise his right against self-incrimination, and confront witnesses, we held that the admonitions and waivers were not necessary. (*Id.* at pp. 592-594; see also *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1029 [251 Cal.Rptr. 643, 761 P.2d 103] [no waiver needed even though defense counsel expressly "conceded defendant's responsibility for the killing"]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-366 [105 Cal.Rptr. 138, 503 P.2d 594].)

Defendant correctly argues that in *People* v. *Hendricks, supra,* 43 Cal.3d at page 592, the record expressly reflected that the defendant agreed with counsel's actions. Here, the record reflects neither agreement nor disagreement. That makes no difference. "The plurality opinion in *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396] made it clear that although counsel does not have authority to override his client's express objection to conceding guilt, there is no requirement of a *Boykin/Tahl* waiver. (*Id.* at p. 818, fn. 8.) Here, unlike in *Frierson,* the record shows absolutely no indication that defendant disagreed with his attorney's tactical approach." (*People* v. *Griffin, supra,* 46 Cal.3d at p. 1029.)

Defendant cites *Brookhart* v. *Janis* (1966) 384 U.S. 1 [16 L.Ed.2d 314, 86 S.Ct. 1245]. There, the defense agreed that the state need only prove a "prima facie case," and that the case would not be contested and the defendant would not cross-examine witnesses. (*Id.* at p. 3 [16 L.Ed.2d at pp. 316-317].) The high court held this procedure required a waiver of constitutional rights. There was, however, no comparable agreement here, thus making that decision inapposite. (*People* v. *Hendricks, supra,* 43 Cal.3d at p. 593.)

In *People* v. *Hendricks, supra*, 43 Cal.3d at page 594, footnote 1, we noted, "The decision on the part of counsel not to present a defense does not involve a question of waiver but rather the issue of effective assistance of counsel." Defendant claims his attorneys were ineffective. To prevail, defendant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694-695, 104 S.Ct. 2052]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1215 [249 Cal.Rptr. 71, 756 P.2d 795].) He cannot overcome that presumption on this record. The decision of how to argue to the jury after the presentation of evidence is inherently tactical; counsel's approach comes within the permissible range of competent representation.

Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt. (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 177 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1186-1187 [9 Cal.Rptr.2d 834, 832 P.2d 146] [counsel conceded defendant's presence at the crime scene, thus repudiating defendant's alibi testimony, but under the "circumstances, we cannot say counsel was constitutionally ineffective in his attempt to make the best of a bad situation"]; *People* v. *Mitcham, supra*, 1 Cal.4th at pp. 1060-1061 ["good trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 306-307 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].) The same applies here.

It is true, as defendant argues, that counsel indicated in the opening statement that identity was one of the issues. But much happened between the opening statement and the closing argument, namely the presentation of evidence. During the evidence portion of trial, counsel for both defendants cross-examined witnesses and presented evidence on the question of identity.[6] When the time came to argue the case to the jury, however, counsel had to base the tactical decisions on how the trial actually went, not how it might have gone.

[6]Defendant also claims his attorneys were incompetent in their presentation of evidence and cross-examination of witnesses. We have reviewed the record; it does not support the claim.

Defendant summarily claims his attorneys incompetently failed to object to admission of Norwood Square's statement to the police after viewing the physical lineup. They did apparently successfully object to the written document being admitted. The record discloses no valid basis for an objection to the testimony itself. It was admitted as past recollection recorded. (Evid. Code, § 1237.) Defendant's assertion that Square had "insufficient present recollection" (Evid. Code, § 1237, subd. (a)) is belied by the record. Square testified that

At the beginning of trial, it was uncertain whether Horton would testify. She had refused to testify at the preliminary hearing, and the district attorney expressed doubt that she would testify at trial. In fact, she did testify, and presented evidence that was devastating to both defendants on the question of identity. However, counsel for defendant elicited from her on cross-examination that defendant told her shortly after the robbery he did not intend to shoot the victim, and that the shooting was an accident. Thus, at the time of argument, the evidence of identity was stronger than counsel might have anticipated at the outset. There were three positive and one tentative eyewitness identifications, plus the testimony of Horton, which was essentially unimpeached. There was no apparent reason why Horton would perjure herself to incriminate the defendants. On the other hand, Horton's testimony helped defendant on the question of intent to kill.

Because of this, counsel had difficult decisions to make regarding the argument. It is inherently difficult to argue to a jury that the defendant did not do it and if he did he did not intend to. In addition, attacking Horton's credibility, which would be necessary to challenge identity, would also effectively attack the helpful portion of her testimony. Counsel could reasonably be reluctant to launch a full attack on her credibility and then try to rely on her testimony regarding intent.

Another factor existed in this case: the codefendant. Counsel for Gutierrez did not have the dilemma facing defendant. Because there was no evidence that Gutierrez intended to kill Koger, no special circumstance was charged as to him. He was charged with murder under the felony-murder rule. The sole issue as to him, therefore, was identity; there was no question of intent. No part of Horton's testimony was useful to Gutierrez. Therefore, counsel for Gutierrez could, and did, fully attack the identity evidence without worrying about losing his credibility. The evidence of identity was largely the same as to both defendants. Except for Norwood Square's tentative identification of defendant, but not Gutierrez, those who identified one defendant identified both. Horton incriminated both. As indicated by the fact Gutierrez called a witness who provided an alibi for defendant but not Gutierrez, challenging identity for one effectively challenged identity for both. Moreover, the testimony of Dr. Loftus regarding factors affecting the reliability of eyewitness identifications, although presented by Gutierrez, applied equally to both defendants.[7]

Counsel could reasonably have believed it unlikely that the jury would find a reasonable doubt regarding identity as to Gutierrez, but not also as to

when he made the statement at the time of the lineup, he was "in complete control of all of my facilities"; "But as far as me remembering it today, no, I don't."

[7] Defendant claims that counsel's failure to examine Dr. Loftus "symboliz[ed] his rejection of" the defense of misidentification, and hence was itself incompetence. We see no such

defendant. Thus, argument on behalf of Gutierrez was also, in effect, argument on behalf of defendant. Counsel could reasonably have chosen to let Gutierrez argue the question of identity, and to concentrate on the issue that concerned defendant alone—intent. That way, defendant could benefit from Gutierrez's argument while allowing counsel for defendant to maintain his credibility with the jury by not making either weak arguments (all eyewitness identifications were wrong and Horton was lying) or inconsistent arguments (Horton was lying but she also was right about intent). Counsel effectively used Horton's testimony without also having to argue to the jury that she should not be believed.

Defendant claims that the witness identifications could have been attacked in various ways. That is no doubt true. The defendants in fact cross-examined the witnesses and presented evidence on identity. As always, there were some inconsistencies in the testimony and the descriptions of the robbers, and other areas of possible attack. But that does not eliminate the hard, practical decisions confronting counsel. Counsel had to decide what approach was best for their client, and base this decision on the precise situation before them. Making this decision, and the record shows convincingly that counsel did make it, is not incompetence. (*People* v. *Kelly, supra,* 1 Cal.4th at pp. 522-523.)

Defendant has also not shown prejudice. In light of the strong evidence of identity, and the fact the codefendant was convicted in the face of largely the same evidence despite his attorney's argument regarding identity, it is not reasonably probable the outcome would have been different had counsel adopted a different strategy. (*People* v. *McPeters, supra,* 2 Cal.4th at p. 1187.)

In a related vein, defendant claims the court erred in its response to a jury question during deliberations, and his attorneys were ineffective in not objecting. During the read-back of testimony at jury request, one juror asked: "It may be out of line, but what is the procedure—I mean, this lineup identification, identification lineups, these suspects were in this lineup because of a flyer—if it's known to the court—because of the flyers that were sent out to the other police departments or maybe a telephone call—." Without objection, the court responded: "The reason for the lineup is to determine and see if a witness can make an identification. That's all you

---

symbolism. Dr. Loftus's testimony was not fact specific, and applied equally to all of the identifications. Failure to cross-examine a favorable witness could easily be read as signaling approval, not rejection, of that testimony. Counsel could reasonably have believed that the examination by counsel for Gutierrez was sufficiently thorough, and there was no benefit to be gained in asking more questions.

have to know. . . . [¶] And the composition of the lineup is not for you to concern yourself."

Because there was no objection to the court's answer, the issue has been waived. (*People* v. *Mitcham*, *supra*, 1 Cal.4th at p. 1053.) Counsel were also not ineffective. They were present, and could best judge the impact the court's comment might have had on the jury, and the possible usefulness of an objection. (See *People* v. *Frierson*, *supra*, 25 Cal.3d at p. 158.) In the context of the case as a whole, counsel might reasonably have felt the comments were understood as merely telling the juror not to be concerned with who the other members of the lineup were. We see neither incompetence nor prejudice.

### 8. *Jury Instructions*

#### (a) *Reasonable Doubt*

■ Defendant challenges the trial court's instruction on the reasonable doubt standard. The United States Supreme Court has recently upheld, for the present at least, the constitutionality of CALJIC No. 2.90, the standard reasonable doubt instruction in California. (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239, affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862].)[8] We have consistently upheld that instruction. (*People* v. *Webb*, *supra*, 6 Cal.4th at p. 531.)

Here, however, the trial court modified the standard instruction slightly. The court instructed on reasonable doubt twice, once before the parties' arguments to the jury, and once after. The first instruction was as follows:

"Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt.

*"Now, the word 'moral' here does not mean religiosity or truthfulness.*

---

[8]CALJIC No. 2.90, which is drawn verbatim from Penal Code section 1096, defines "reasonable doubt" as follows: "It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." This language is derived from an opinion by Chief Justice Shaw of Massachusetts. (*Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295; see *People* v. *Brigham* (1979) 25 Cal.3d 283, 294 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.).)

*The word 'moral' really means mortal; in other words, evidence from people.*

*"So, let me start again.*

"Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence, *that is, evidence which comes to you from the mouths of people*, is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Italics added to denote the court's additions to CALJIC No. 2.90.)

The second time, the court defined "reasonable doubt" as "not a mere possible doubt because everything relating to human offense—human affairs and depending upon *evidence from people* is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Italics added to show the court's variation from the term "moral evidence" found in CALJIC No. 2.90.)

In essence, the trial court told the jury that the phrase "moral evidence" meant mortal evidence, or evidence from people or from the mouths of people. Citing Penal Code section 1096a, defendant contends the court erred by modifying "the venerable common law definition of reasonable doubt first enunciated by Chief Justice Lemuel Shaw in the famed case of *Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295, 320." This contention must be considered in light of the United States Supreme Court's analysis of that same instruction.

In *Victor* v. *Nebraska, supra*, 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], the defendant challenged the constitutionality of CALJIC No. 2.90. His "primary objection [was] to the use of the phrases 'moral evidence' and 'moral certainty' in the instruction." (*Id.* at p. __ [127 L.Ed.2d at p. 593, 114 S.Ct. at p. 1245].) Although expressing concern that, in isolation, the challenged phrases do not contain the meaning today that they had in the 19th century, the high court, viewing the instruction in its entirety, rejected the challenge. It held, "Moral evidence, in this sentence [in CALJIC No. 2.90], can only mean empirical evidence offered to prove such matters—the proof introduced at trial." (*Id.* at p. __ [127 L.Ed.2d at p. 595, 114 S.Ct. at p. 1246].) The court was "more concerned" with the phrase " 'moral certainty.' " (*Id.* at p. __ [127 L.Ed.2d at p. 595, 114 S.Ct. at p. 1247].) It found the

term "ambiguous in the abstract," but saved by its context. (*Ibid.*) "An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." (*Ibid.*) The court thus concluded that although the questioned terms add nothing of value to the instruction, they do not render it unconstitutional.

While finding the instruction not so unclear as to violate the Constitution, the court criticized the use of the word "moral," a criticism echoed in separate opinions by individual justices. "At the same time, however, we do not condone the use of the phrase ['moral certainty']. As modern dictionary definitions of moral certainty attest, the common meaning of the phrase has changed since it was used in the *Webster* instruction, *and it may continue to do so to the point that it conflicts with the [In re Winship* (1970) 397 U.S. 358 (25 L.Ed.2d 368, 90 S.Ct. 1068)] *standard [of reasonable doubt].*" (*Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248], italics added.) Justice Kennedy found "California's use of 'moral evidence' is the most troubling, and to me seems quite indefensible." (*Id.* at p. __ [127 L.Ed.2d at p. 601, 114 S.Ct. at p. 1251] (conc. opn. of Kennedy, J.).) Justice Ginsburg agreed "that the term 'moral certainty,' while not in itself so misleading as to render the instructions unconstitutional, should be avoided as an unhelpful way of explaining what reasonable doubt means." (*Id.* at p. __ [127 L.Ed.2d at p. 601, 114 S.Ct. at p. 1252] (conc. opn. of Ginsburg, J.).)

Penal Code section 1096a provides, "In charging a jury, the court *may* read to the jury section 1096 of this code [i.e., CALJIC No. 2.90], and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." In light of this provision and *Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], it is clear that giving CALJIC No. 2.90 is not error, at least not yet. It is equally clear, however, that Penal Code section 1096a, although stating that the standard instruction "may" be given and, if given, is sufficient, does not *require* that precise language. Nothing in that section prohibits trial courts from modifying the instruction.

It is true, as defendant argues, that appellate courts have long cautioned against "an impromptu instruction on reasonable doubt." (*People* v. *Yoshimura* (1979) 91 Cal.App.3d 609, 632 [154 Cal.Rptr. 314]; see also *People* v. *Paulsell* (1896) 115 Cal. 6, 10 [46 P. 734]; *People* v. *Garcia* (1975) 54 Cal.App.3d 61, 63-68 [126 Cal.Rptr. 275].) This is not because the instruction cannot be improved today. As *Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239] attests, it certainly can. (See also *People* v. *Brigham, supra,* 25 Cal.3d at p. 290, fn. 11 (maj. opn.); *id.* at pp.

292-316 (conc. opn. of Mosk, J.).) Rather, it is because varying from the standard is a "perilous exercise." (*People* v. *Yoshimura, supra,* 91 Cal.App.3d at p. 632.)

Although modifying the standard instruction is perilous, and generally should not be done, today it might be more perilous for trial courts *not* to modify it in a narrow and specific manner in light of the high court's statement that the instruction's "common meaning . . . may continue to [change] to the point that it" becomes unconstitutional. (*Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248].) A slight modification in view of that decision might be deemed safe, indeed safer than not making it. The high court made clear that the terms "moral evidence" and "moral certainty" add nothing to the jury's understanding of reasonable doubt. It thus seems that trial courts might, in the future, safely delete the following phrases in the standard instruction: "and depending on moral evidence," and "to a moral certainty."[9]

Making these changes, and no others, would both avoid the perils that have caused appellate courts to caution trial courts against modifying the standard instruction, and satisfy the concerns the high court has expressed regarding that instruction. In light of Penal Code section 1096a, we cannot and do not require trial courts to change the standard language; rather, we note that it is permissible, and safer, to make the narrow changes suggested herein. We also continue to caution against trial court experimentation; individual courts should not otherwise modify the standard instruction. More extensive changes—such as those discussed in the concurring opinions— might be preferable but must be left to others. We urge the Legislature or the Committee on Standard Jury Instructions—Criminal of the Los Angeles Superior Court (the CALJIC committee) to examine this matter comprehensively so that California may have the best possible instruction. The clarity and constitutionality of California's instruction on reasonable doubt are too important to simply ignore the high court's warning signals.

Here, the trial court survived the peril inherent in modifying the standard instruction. Indeed, although it did not entirely anticipate the high court's opinion, it arguably improved the standard instruction by defining "moral evidence" as "mortal" evidence, or evidence from people or the mouths of people. This meshed nicely with the standard phase, used by the trial court,

---

[9]With these modifications, the instruction would read: "It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

"everything relating to human affairs," and came closer than the standard instruction to the high court's formulation of "the proof introduced at trial." Proof introduced at trial is necessarily mortal evidence or evidence from people or the mouths of people. Defendant argues this reformulation diminished the prosecution's burden. We disagree. The trial court used the phrase "an abiding conviction" that the high court held saved the standard instruction. If the term "moral evidence" passes muster, as the high court concluded, the court's modification certainly does. We stress, however, that future trial court modifications of the standard instruction should not be based on what the trial court did here (without benefit of the decision of *Victor* v. *Nebraska*, *supra*, 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]), but should be limited to those suggested in this opinion pending possible action by the Legislature or CALJIC committee.

Defendant also claims that immediately after defining "reasonable doubt," the trial court erroneously gave former CALJIC No. 22 (rev.), an instruction we disapproved in *People* v. *Brigham*, *supra*, 25 Cal.3d at page 292. The court, however, modified that instruction by adding two crucial words. As modified, the court instructed: "The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces *an abiding* conviction in an unprejudiced mind." (Italics added to indicate the court's addition to the former standard language.)

In *Brigham*, we criticized former CALJIC No. 22 (rev.) because it "speaks only of 'conviction'" whereas CALJIC No. 2.90 "speaks of an 'abiding conviction.'" (*People* v. *Brigham*, *supra*, 25 Cal.3d at p. 290.) Here, the court corrected that problem by adding the words "an abiding." We also found that the instruction "served no useful purpose," which continues to be true today. (*Id.* at p. 292.) It is itself insufficient and is unnecessary in light of CALJIC No. 2.90. Therefore, trial courts should not give that instruction in any form. But giving it as was done here did not prejudice defendant. It was redundant, but innocuous.

(b) *Circumstantial Evidence and Intent to Kill*

Regarding circumstantial evidence, which was relevant to the question of intent to kill, the court instructed: "[Y]ou cannot find a defendant guilty of any charge against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime but cannot be reconciled with any other rational conclusion. Each fact which is essential to complete a set of circumstances

necessary to establish a defendant's guilt must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence as to any count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that which points to his innocence and reject that which points to his guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other to be unreasonable, it is your duty to accept the reasonable interpretation and to reject the unreasonable."

The court gave similar instructions regarding proof of the special circumstance.

 Defendant challenges the word "appears" in the final paragraph of the language quoted above, which is found in several standard instructions. (See CALJIC Nos. 2.01, Sufficiency of Circumstantial Evidence—Generally; 2.02, Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State; 8.83, Special Circumstances—Sufficiency of Circumstantial Evidence—Generally; 8.83.1, Special Circumstances—Sufficiency of Circumstantial Evidence to Prove Required Mental State.) We have already rejected a similar challenge. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 386 [279 Cal.Rptr. 780, 807 P.2d 1009].) "The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." (*Ibid.*; see also *People* v. *Wilson* (1992) 3 Cal.4th 926, 942-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)

Defendant also complains that, immediately following the first paragraph quoted above, the court did not give the following sentence found in CALJIC No. 2.01: "In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt." (See also comparable language in CALJIC No. 8.83, which the court also did not give.)

In this case, circumstantial evidence was not significant to the question of identity. That was shown by multiple eyewitness identifications and evidence that defendant admitted his involvement to Horton. Regarding the mental state of intent to kill, the titles, text and use notes of the instructions

all indicate that CALJIC Nos. 2.02 and 8.83.1, not 2.01 and 8.83, are the correct instructions. The correct instructions do not include the omitted sentence. In fact, the court added this sentence from CALJIC Nos. 2.01 and 8.83 that is not in CALJIC Nos. 2.02 and 8.83.1: "[E]ach fact which is essential to complete a set of circumstances necessary to establish a defendant's guilt must be proved beyond a reasonable doubt." Whether that sentence is appropriate to questions of mental state is problematic, but defendant cannot complain of any error in that regard, as it tended to *increase* the prosecution's burden. We find no error prejudicial to defendant.

 Defendant also argues that in instructing the jury on the elements of the special circumstance, the court erroneously did not give CALJIC No. 3.31, which tells the jury there must be a concurrence of the act and specific intent. Failure to give the instruction, defendant argues, removed the element that defendant must have intended to kill at the time of the act, i.e., at the time he shot Koger. The jury, however, was told that for the special circumstance to be true, defendant must have "intended that a human being, to wit, Donald Koger, be killed." The court also discussed with the jury the question of how it should determine the "mental state with which an act is done. . . ."

There is no reasonable likelihood the jury would interpret these instructions as allowing it to find the special circumstance true if it believed defendant intended to kill Koger at some time, but not at the time he actually killed him. (*People* v. *Kelly*, *supra*, 1 Cal.4th at p. 525.) Nor is there any evidence whatsoever upon which the jury could base such a finding. Under the evidence, no reasonable jury could possibly find that defendant did not intend to kill Koger at the time he shot him, but did intend to kill him either some time before or after the shooting. There was no error.

### (c) *CALJIC No. 2.27*

Defendant contends the court erred in not giving CALJIC No. 2.27, the cautionary instruction regarding the sufficiency of the testimony of one witness. The court, however, *did* give the instruction. Because of this, we need not decide whether the instruction was necessary.

### (d) *Accomplice Instructions*

 Defendant contends the court should have given accomplice instructions as to witness Horton, including that her testimony had to be corroborated and should be viewed with distrust. However, there was no evidence that Horton was an accomplice. None of the three robbers was a

woman, and Horton was not otherwise involved in the robbery itself, such as helping to asport the "loot" to a place of temporary safety. (See *People* v. *Cooper, supra,* 53 Cal.3d 1158, 1169-1170.)

To be sure, there was evidence that Horton was an *accessory* to the crimes; she admitted that she disposed of the murder weapon. (See Pen. Code, § 32.) That no doubt explains why she was given immunity for her testimony. But an accessory is not "liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) Hence, "[m]ere accessories are not accomplices under section 1111." (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1173 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; see also *People* v. *Garceau* (1993) 6 Cal.4th 140, 183 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 867 [277 Cal.Rptr. 122, 802 P.2d 906].) For these reasons, accomplice instructions were unnecessary. (*People* v. *Howard, supra,* 1 Cal.4th at pp. 1173-1174.) Moreover, Horton's testimony was more than amply corroborated by the multiple eyewitness identifications of this case.

 Defendant also contends that the court should have given the cautionary instructions because of the grant of immunity. None was requested, and there is no such duty to give such instructions sua sponte. (*People* v. *Daniels, supra,* 52 Cal.3d at p. 867, fn. 20.) Defendant also contends his attorneys were ineffective. We need not decide whether cautionary instructions should be given upon request, for there was a tactical reason for not requesting them here. Part of Horton's testimony was useful to the defense on the question of intent to kill. Therefore, counsel might not have wanted the court to tell the jury that Horton's testimony should be viewed with caution.

The jury was fully instructed how to judge credibility. It knew Horton had been immunized, and could fully decide for itself if and how the grant of immunity affected her credibility. There was neither error nor incompetence.

### 9. Effectiveness of Counsel

Defendant contends his attorneys were ineffective in a host of ways. The record does not support the claim. Those specific contentions that are sufficiently developed to be cognizable have been or will be discussed elsewhere in this opinion. Defendant argues in general that he filed various pro se pleadings and repeatedly complained about his attorneys in both state and federal courts. This is certainly correct. But complaints do not themselves prove they are well founded. Defendant must affirmatively show

ineffectiveness. (*People* v. *Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].) Mere allegations and complaints, even if repetitive, do not suffice.

Defendant argues that his attorneys did not file enough motions and written points and authorities, and did not "advocat[e] or supplement[]" some of his own pro se motions. He has not, however, shown a single potentially meritorious motion that was not pursued, or that any motions that were pursued were done so ineffectively. ▪▪▪ As noted before, counsel is the captain of the ship (*In re Horton*, *supra*, 54 Cal.3d at p. 95), and need not do everything the defendant may personally desire, no matter how unmeritorious or possibly even harmful to the overall defense. Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances. (See generally, *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1002-1003 [118 Cal.Rptr. 391].)

The record reflects that counsel for defendant acted competently in their defense of this case. That their efforts ultimately failed, as do the efforts of many attorneys in many cases, may be explained by the evidence against defendant and the nature of the crimes, and not by any failings on their part.

10. *Unreported Proceedings*

Penal Code section 190.9, subdivision (a), provides in pertinent part: "In any case in which a death sentence may be imposed, all proceedings conducted in the justice, municipal, and superior courts, including proceedings in chambers, shall be conducted on the record with a court reporter present." Although section 190.9 has been amended in other respects, the quoted language has applied to all proceedings conducted after its effective date of January 1, 1985. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 920 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

▪▪▪ Despite this statutory mandate, the trial court presided over various conferences off the record, both at the bench in front of the jury and in chambers outside the presence of the jury, that occurred well after the statute's effective date. Defendant contends this was reversible error. Error it was; in the absence of prejudice, however, it is not reversible. Defendant "bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review." (*People* v. *Cummings* (1993) 4

Cal.4th 1233, 1333-1334, fn. 70 [18 Cal.Rptr.2d 796, 850 P.2d 1]; see also *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 66-67 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People* v. *Howard, supra,* 1 Cal.4th at pp. 1165-1166; *People* v. *Pinholster, supra,* 1 Cal.4th at pp. 919-923.)

Defendant has not met this burden. At defendant's request, hearings have been held, and the record has been settled, as to the unreported proceedings. He has not shown that the settlement has been inadequate. The conferences were usually of routine matters, including various stipulations during jury selection. When anything of consequence occurred, the substance was usually placed on the record. Unreported rulings were generally in defendant's favor, and those that were not present an adequate record to allow appellate review. There were unreported conferences regarding jury instructions, but the parties were then allowed to place any objections on the record. This did not prevent defendant from now challenging the instructions.

Defendant's ability to fully litigate any issue on appeal has thus not been compromised by the unreported conferences. "We find the record before us adequate to the task at hand: Resolution of defendant's claims does not depend upon a verbatim transcription; hence, the settled statement suffices. [Citations.] On this basis, we also find no violation of defendant's due process right to meaningful appellate review." (*People* v. *Hawthorne, supra,* 4 Cal.4th at pp. 66-67.) Defendant challenges the accuracy of the settled record. "The settlement of the record, however, is primarily a question of fact to be resolved by the trial court. [Citation.] Once settlement is ordered, the trial court has broad discretion to accept or reject counsel's representations in accordance with its assessment of their credibility. [Citation.]." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 116 [279 Cal.Rptr. 276, 806 P.2d 1311]; accord, *People* v. *Clark* (1993) 5 Cal.4th 950, 1011 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) We see no abuse of discretion.

Defendant contends he was indeed prejudiced. Some of the instances he complains of are discussed elsewhere in this opinion. He claims there were unreported proceedings regarding the prosecutor's written "notice of intention to introduce evidence in aggravation." The settled record does indicate that off the record, the court limited the prosecution's aggravating evidence to that which was in fact presented, and that it "advised" the prosecutor "he could not argue future dangerousness." Defendant has shown no inability to litigate any issue these rulings present. Defendant also claims there were unreported hearings related to his hearing difficulties. The contents of one, on January 28, 1987, were immediately placed on the record. The settled record states the contents of another, on February 5, 1987. We have reviewed defendant's other claims, and similarly find no prejudice. The record is sufficient to afford full appellate review.

Although we find no prejudice, we emphasize that trial courts should meticulously comply with Penal Code section 190.9, and place all proceedings on the record. It can seem burdensome, as it apparently seemed to the court and parties in this case, to discuss routine matters and conduct bench conferences on the record before a court reporter. But, in addition to assuring an adequate record for appellate review, which this record, as settled, does, following that mandate can ultimately save much time and effort in preparing the appellate record. Here, two substantial record settlement proceedings in superior court were required, proceedings that would not have been necessary had Penal Code section 190.9 been followed. If the trial court had taken the necessary care, and conducted *everything* on the record, substantial delay, expense, and squandering of judicial resources could have been avoided.

■■■ Defendant also argues that some of the unreported hearings violated his right to be present. However, "a defendant does not have a right to be present at every hearing held in the course of a trial." (*People* v. *Price, supra*, 1 Cal.4th at p. 407.) He has a right to be personally present only if his presence bears a reasonable and substantial relation to his full opportunity to defend against the charges. (*People* v. *Jones* (1991) 53 Cal.3d 1115, 1140-1141 [282 Cal.Rptr. 465, 811 P.2d 757]; *People* v. *Clark, supra*, 5 Cal.4th at pp. 1011-1012.) Defendant has not shown that any absence prejudiced him or denied him a fair or impartial trial. (*Ibid.*)

11. *Alleged Frivolous Courtroom Atmosphere*

■ Defendant contends the "courtroom atmosphere was frivolous and antithetical to the seriousness of the proceedings, and destroyed [his] entitlement to a fair trial and due process of law." He refers to a number of exchanges among counsel for both sides and the court that were intended, with varying degrees of success, to be humorous. The exchanges often, although not always, occurred outside the presence of the jury. Defendant has waived the contention by failing to object to the complained-of comments. (*People* v. *Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Melton* (1988) 44 Cal.3d 713, 753 [244 Cal.Rptr. 867, 750 P.2d 741].)

On the merits, we find no error. Although a jury trial, especially for a capital offense, is obviously a serious matter, "Well-conceived judicial humor can be a welcome relief during a long, tense trial. Obviously, however, the court should refrain from joking remarks which the jury might interpret as denigrating a particular party or his attorney." (*People* v. *Melton, supra*, 44 Cal.3d at pp. 753-754.) We have reviewed the entire record,

including each example defendant cites in support of his claim. During the course of the lengthy trial, the court and counsel engaged in occasional good-natured repartee. At no time did either court or counsel cross the line from the proper to the improper. No comments denigrated either defendant or his attorneys in any significant manner. Moreover, even if we were to assume that any of the exchanges were improper, there is no suggestion of prejudice to defendant. The trial as a whole, especially the portion in front of the jury, was conducted with appropriate solemnity.

## B. *Penalty Phase*

### 1. *Evidence of the 1961 Robbery*

■ Defendant contends the court should have excluded James Peters's testimony regarding the facts of the 1961 armed robbery. He has waived the contention by failing to object. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 987 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Moreover, there would have been no basis for the court to exclude the testimony upon an objection; therefore, contrary to defendant's claim, counsel was not ineffective. "The short answer to this claim is that the evidence is expressly made admissible by factor (b) of [Penal Code] section 190.3. The court is not given discretion under Evidence Code section 352, to exclude this evidence when offered at the penalty phase where . . . the question for the jury is not one of fact in determining guilt." (*People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189]; accord, *People* v. *Zapien, supra,* 4 Cal.4th at p. 987.) Remoteness is not a ground to exclude penalty phase evidence of violent criminal activity, as it "affects the weight, not admissibility, of the offense." (*People* v. *Anderson* (1990) 52 Cal.3d 453, 476 [276 Cal.Rptr. 356, 801 P.2d 1107].)

The court does have limited discretion under Evidence Code section 352 regarding the *form* of penalty phase evidence, that is, the way in which the prosecutor seeks to present the case. (See *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 140 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Here, there was nothing questionable about the form of the evidence, consisting of live testimony of a victim, and thus no reason for the court to insist on the prosecutor presenting the facts in a different form.

Defendant also challenges the evidence on various grounds that we have repeatedly rejected. (See *People* v. *Fierro, supra,* 1 Cal.4th at pp. 230-232.)

### 2. *Effectiveness of Counsel*

Defendant contends his attorneys were ineffective in their penalty phase representation. Some of the specific contentions have been or will be

discussed elsewhere in this opinion. We reject the others. ■ In analyzing the contentions, we must keep in mind the strong presumption that counsel's actions fell within the wide range of reasonable professional assistance. We also evaluate the conduct from counsel's perspective at the time of the acts or omissions complained of. (*People* v. *Bunyard, supra,* 45 Cal.3d at p. 1215.)

■ Defendant contends his attorneys were incompetent in failing to cross-examine Peters, who testified about the 1961 burglary. He does not state what cross-examination they were supposed to have conducted. Peters's direct examination was brief and unemotional, and, so far as the record shows, undisputed. After all, defendant had been convicted of the crime. Counsel could reasonably have concluded it best if the witness, one of defendant's victims, was in and out of the courtroom as quickly as possible. Cross-examination could easily have been counterproductive by making the jury even more sympathetic to the witness and allowing him to describe once again defendant's criminal behavior. Although counsel were entitled to cross-examine the witness, they were not required to do so upon pain of being branded incompetent.

Defendant challenges the presentation of the defense case in mitigation. He complains that his attorneys presented only four witnesses, and that their testimony took less than one day. He asserts, with no record support, that there was "mitigating evidence that could have been presented, but was not." But so far as the record shows, this is mere assumption. Nothing rebuts the presumption that counsel presented the case as well as they reasonably could under the circumstances.

■ Even if we somehow assume additional mitigating evidence existed, counsel did not necessarily have to present it. As always, counsel had to consider the possible detriment as well as the benefit. Presenting mitigating evidence risks opening the door to rebuttal evidence. "The prosecution may rebut mitigating penalty evidence with unfavorable revelations about the defendant. In rebuttal, the prosecution is bound neither by its statutory pretrial notice of aggravating evidence [citation] nor by the aggravating factors set forth in the statute. [Citations.] The possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1251 [275 Cal.Rptr. 729, 800 P.2d 1159].) ■ Here, the defense case triggered no rebuttal whatsoever.

Nothing supports defendant's contention that counsel acted incompetently regarding the evidence they did put on. Defendant cites a question counsel

posed to a defense witness that showed momentary confusion regarding the facts, but nothing close to incompetence is thereby shown. Any confusion was quickly straightened out, and may even have suggested to the jury that the evidence was coming from the witnesses, not orchestrated by counsel.

The use counsel made of the witnesses they called came within the wide range of competence. For example, contrary to defendant's argument, it may well have been wise to use defendant's former wife solely to introduce the couple's two young daughters to the jury, an introduction that would undoubtedly have an emotional impact favorable to defendant. It is pure speculation to assume she was able or willing to provide useful mitigating evidence that would not open the door to harmful rebuttal, or to assume, as defendant does, that she had a "loving relationship[]" with him. Moreover, since defendant spent much of his adult life in prison, counsel may reasonably not have wanted to dwell on that life more than they did.

Defendant also claims that counsel incompetently argued the case to the jury. Each side argued twice, with the prosecution going first, the defense second, the prosecution rebutting the defense, then finally the defense rebutting the prosecution. Each of defendant's two attorneys presented one of the arguments. We have reviewed the arguments, and have found nothing inadequate in them whatsoever. Unlike *People* v. *Mayfield*, *supra*, 5 Cal.4th at page 186, where we found no prejudice, the defense argument was not "perfunctory." Between them, counsel presented the defense arguments vigorously and thoroughly, and, at times, eloquently. Defendant's current contentions are merely second-guessing in the light of hindsight, and fall far short of demonstrating incompetence.

### 3. *Alleged Prosecutorial Misconduct and Related Contentions*

Defendant alleges several counts of prosecutorial misconduct. We conclude that none, either singly or collectively, warrant reversal.

#### (a) *Reference to Possible Additional Evidence*

After the defense presented its penalty phase evidence, the court asked the district attorney in front of the jury if there was anything further. He responded, "Not at this time, no." The court stated, "If you don't do it at this time, I don't know when you're going to do it." The district attorney then said, "I may have a rebuttal witness but I'm not sure you'll allow me to put him on." Ultimately, there was no further evidence. Defense counsel moved for a mistrial, arguing that the reference to a possible rebuttal witness implied to the jury there was additional aggravating evidence the court

would not allow. The district attorney responded that he had some evidence regarding possession of razor blades in prison, and he did not want to rest until he could argue for its admission. The court denied a mistrial, stating, "The jury has heard a lot of instructions. They know to base the decision on what they hear. I told them a million times: The statements of attorneys are not evidence and I think we're overly reacting."

Defendant complains of the comment regarding a possible rebuttal witness. The district attorney had to say something when the court wanted to know if there was anything further. While he certainly could have more artfully preserved his option to argue the matter later, we agree with the trial court that there was no prejudice. This reference to possible rebuttal was brief and vague. It was never exploited. The jury was instructed at both the guilt and the penalty phases that statements of the attorneys are not evidence, and not to consider any statement by an attorney not supported by the evidence. "Any harm flowing from the alleged misconduct was thereby cured." (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213].)

### (b) *Religious References*

The district attorney began his opening argument to the jury by stating, "Thou shalt not kill." He then recounted the history of that command, and included numerous biblical references. He also discussed the historical origins of the death penalty, again with biblical references. He stated, "In every civilization in the history of this world as you look back through, civilizations among us now, civilizations in the far past, great civilizations, small civilizations, ancient ones, new ones, modern ones, old ones, religious ones, nonreligious ones, all came forth with the same tenet. If you kill, you will be removed. You will be killed yourself. It's nothing new." He made additional biblical and religious references during the opening and closing arguments.

We have generally condemned invocations to a different or higher law than that found in the California Penal Code. (*People* v. *Wash* (1993) 6 Cal.4th 215, 260-261 [24 Cal.Rptr.2d 421, 861 P.2d 1107], and cases cited therein.) "What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority." (*People* v. *Sandoval, supra,* 4 Cal.4th at p. 194, affd. *sub nom. Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239].)

Defendant has waived this contention by failing to object. (*People* v. *Wash, supra,* 6 Cal.4th at pp. 259-260.) "Trial counsel not only failed to

object, but *he* relied at length on the Bible as support for *not* imposing the death penalty." (*People* v. *Hill* (1992) 3 Cal.4th 959, 1012 [13 Cal.Rptr.2d 475, 839 P.2d 984], italics in original.)

Defendant contends his attorneys were ineffective. "[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal. [Citation.] Here, defense counsel did not object; rather, he countered the prosecution argument with argument of his own." (*People* v. *Frierson* (1991) 53 Cal.3d 730, 749 [280 Cal.Rptr. 440, 808 P.2d 1197].) Counsel adeptly turned the argument around: "You know," he responded to the jury, "it's interesting that [the district attorney] read the Bible. He sort of when he gets to talking, he left out Christ's sermon on the mountain where Christ said . . . ." He then quoted from the Sermon on the Mount, concluding, " 'Judge not that ye be not judged. For with that judgment ye judge ye shall be judged; and with what measure ye mete, it shall be measured to you again.' " We cannot say this tactic was unreasonable.

We also find no prejudice. The district attorney did not urge the jury to impose biblical law. He made it clear, as did the court and defense counsel, that *California* law applied. The historical review and religious references were merely introductory to a discussion of the law the jury had to apply. The prosecutor stressed that "in our particular society, in this state, we have narrowed it down to the most dangerous of people, a specific area in which the penalty of death applies." He noted that under California law, "not all killers, not all murderers fall within the death penalty. It is an extremely narrow law. The death penalty only applies in a very limited situation, one that happens to occur here." He accurately described this narrowing process, noting that even after the jury found an intentional first degree murder with special circumstances, "the law goes further and says you just don't get to apply the death penalty to anybody. The aggravating has to so substantially outweigh the mitigating that it warrants death. So, we have narrowed it even further."

In light of this, the religious references were not so much prejudicial as pointless. They invited the defense to effectively respond in kind, as it did. "Thus, we do not believe the objectionable remarks could reasonably have diminished the jury's sense of responsibility, or displaced the court's instructions." (*People* v. *Wash, supra,* 6 Cal.4th at p. 261.)

### (c) *Quoting One of the Jurors*

Without objection, the district attorney read a "quote" to the jury.[10] He then announced that the quote was not from an attorney or a judge, but from one of the "prospective members of the panel" during the individual death-qualifying voir dire, and described it as "an attempt by a member of the panel to explain what the system meant to that person and how they fit in." He reread the same quote, and later asked the jury to "remember" it. The quoted juror sat on the actual jury that heard the argument. Defense counsel Strellis had asked the question that elicited the response two months earlier.

Defendant argues this was "overt flattery of a sitting juror." The Attorney General responds, first, that the matter has been waived by the failure to object. Defendant answers that by attributing the quote to a "prospective" juror, the prosecutor caused defense counsel to not know that the quote was from a juror listening to the argument, which made it most objectionable. The Attorney General counters that the juror had been, indeed, a prospective juror at the time of the quote, and only later became an actual juror, and that defense counsel were present and elicited the quote. On balance, we agree with defendant. The voir dire in question occurred two months before the argument. Counsel examined many jurors during the lengthy selection process. It is unreasonable to expect counsel to remember who the quote was from, especially since the prosecutor ascribed it solely to a "prospective" juror. Since counsel were not effectively on notice that the prospective juror was also a sitting juror, we find the absence of an objection does not waive the issue.

On the merits, the argument was improper in two respects. First, although the Attorney General is technically correct that the speaker was only a prospective juror at the time of the quote, for the district attorney not to further identify him as a sitting juror was misleading. Second, counsel should not quote individual jurors in their argument to the entire jury. In *People* v. *Wein* (1958) 50 Cal.2d 383, 395 [326 P.2d 457], overruled on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], we stated that "arguments should be addressed to the jury as a body and the practice of addressing individual jurors by name during the argument should be condemned rather than approved. . . ." (Accord, *Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451,

---

[10]The quote is as follows: " 'I would say there has to be a measuring in a society of people who are standing up and supporting the system of justice. There has to be a standard for which all people have to live by and I think when someone goes so far outside that standard that they create a menace to that society that they create a situation where even in prison they are a menace in that prison and that the crime itself is abhorring and violates justice and the morality of people, then the death penalty is warranted.' "

473 [130 Cal.Rptr. 786].) If counsel should not address individual jurors by name, they should similarly not quote individual jurors.

Nevertheless, "it does not follow that such conduct is necessarily prejudicial in any given case." (*People* v. *Wein, supra,* 50 Cal.2d at pp. 395-396; accord, *Neumann* v. *Bishop, supra,* 59 Cal.App.3d at p. 474.) As in these cases, we find the impropriety harmless. The quotation itself contained nothing improper. Neither the quote nor the argument suggested that the juror, or any juror, should not engage in the required individualized weighing process. We find no reasonable possibility the complained of comments affected the penalty determination. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 990.)

### (d) *Alleged Impugning of Defense Counsel's Integrity*

 Defendant contends the prosecutor impugned the defense attorneys' integrity. We disagree. Although some of the district attorney's comments were improper, they were also innocuous.

In his opening argument, the district attorney stated: "It is interesting not one of those witnesses had talked to Fred Freeman before they came to court except mom. They just got on the stand and said whatever Mr. Strellis wanted them to say because he led them through most of the testimony." Defense counsel Strellis objected, and stated, "I never asked for perjury in my life." The court overruled the objection, observing, "Nobody said anything about perjury."

Defendant contends this effectively accused counsel of suborning perjury. It did not. It merely indicated what the jury could observe for itself, that defense counsel asked careful, specific questions to elicit the testimony he wanted. In context, the district attorney did not suggest the testimony was untruthful, merely that it was of limited value. We find no impropriety.

In his rebuttal argument, the district attorney stated: "And then Mr. Braverman [defendant's second attorney] turned to you and told you that this should be reserved for the worst possible people. He begged you for Fred Freeman's life. Yet in 1979, when he represented another guy who was one of the worst possible people, he begged for his life, too. He is just begging for the life of the client in this case." Defendant later moved for a mistrial, arguing that the reference to his arguments in the other case "is outside the record. It was improper." The court denied the motion. It was indeed improper for the district attorney to refer to counsel's argument in another case. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 922-923 [254 Cal.Rptr. 508,

765 P.2d 940].) But we perceive no prejudice. The district attorney suggested that the facts in the other case were worse than in this, which could hardly harm defendant. It would not astonish the jury to be told that counsel would also argue for life in another case, even if the facts *were* worse. No reasonable juror would infer that the propriety of death in *this* case should not be individually assessed.

Defendant also complains of two objections by the prosecutor during defense counsel's rebuttal argument. Defense counsel argued, "I was never spanked. Incidentally, Mr. Quatman [the prosecutor] told me neither was he." The district attorney objected, stating, "[T]hat's incorrect. Mr. Strellis is making this stuff up." The court responded, "Let's go on. [¶] Again, ladies and gentlemen, this is argument of counsel." A short time later, defense counsel argued, "Now, he [the prosecutor] has access to records; and I don't." The prosecutor again objected, stating, "That's incorrect again. Mr. Strellis is making this stuff up. He has access." The court responded, "I don't know what he's going to say until he says it first. [¶] Go ahead." Defendant later moved unsuccessfully for a mistrial.

Defendant argues the district attorney accused counsel of lying. Whether he accused counsel of lying or merely going outside the record is problematic. Reasonable jurors would most likely interpret the comments as saying there was no evidence to support what defense counsel claimed. But either way there has been no prejudice. Whether or not the prosecutor had said he had not been spanked was trivial. The jury knew it was beyond the scope of the evidence. The same is true of the question of access to records. None of this involved any of the significant issues at trial. There was no prejudicial impugning of defense counsel.

(e) *Describing Defendant as a "Homicidal Maniac"*

In his opening argument, the district attorney stated that defendant's sister "gave you a reason for the killings. She basically said: I know exactly why he's killed all these people or at least this one person." In discussing the testimony that defendant's father abused him, the district attorney noted that the father did not turn his other children into "homicidal maniacs," and then discussed the case "[e]ven if dad had turned [defendant] into a homicidal maniac . . . ." He used the phrase "homicidal maniac[s]" four times. In his closing argument, the district attorney stated, "He's killed once more. How are you going to keep him from doing that again in prison?"

Defendant argues the district attorney improperly suggested defendant had committed more than one murder, and that the references to "homicidal maniac" were inflammatory. He did not object, thus waiving the

contention. (*People* v. *Ashmus*, *supra*, 54 Cal.3d at p. 989.) Defendant contends his attorneys were ineffective. We disagree. As noted, the failure to object rarely establishes prejudice. Here, counsel Strellis countered the statements with argument of his own. (*People* v. *Frierson*, *supra*, 53 Cal.3d at p. 749.) He responded: "Is my client a homicidal maniac? [¶] Did you find any evidence of that? Is there any likelihood of that? Truthfully? [¶] Are you a little amazed? I was amazed." There was no need for counsel to object regarding the number of murders. Although the district attorney misspoke when he said defendant killed "once more," there was no serious suggestion of additional murders. Indeed, the prosecutor himself stated, "This is not a mass-murder situation. . . . You were all asked and told that the law applies in this case specifically to one murder during the course of one robbery—a couple of robberies in a bar, but basically one activity."

### (f) "Inflammatory and Improper" Nonstatutory Aggravating Factors

In an amalgam of claims, defendant contends the court "invited" the jury to consider nonstatutory aggravating factors or factors not supported by the evidence, and the district attorney committed misconduct in arguing such factors. The record does not support the claims.

Just before trial, the district attorney filed a "Notice of Intention to Introduce Evidence in Aggravation," which included alleged misconduct in prison or jail in addition to the prior robberies. Early in the trial, the court noted that the notice was "lacking in specificity," and made no ruling on the admissibility of the evidence. The question was never again raised on the record. To the extent defendant complains about the alleged prison misconduct evidence, he could not have been prejudiced because it was never presented. Defendant argues that these circumstances either induced or aggravated the other alleged error regarding aggravating factors. Neither the record nor logic supports this claim, except that the fact the evidence was not presented affected what the district attorney could argue to the jury. Defendant's claims regarding the aggravating factors must be judged on their own merits.

Defendant contends the district attorney's description of him as a "homicidal maniac," combined with his earlier reference regarding possible rebuttal evidence that was never presented, suggested there was, indeed, another murder. We disagree. Even the district attorney stated this case involved only one murder; the jury could not have been misled.

Defendant contends the district attorney improperly argued future dangerousness by noting that defendant had killed before, and might in prison.

Defendant's mistrial motion was properly denied. Although expert testimony on future dangerousness is not permitted, the prosecutor may *argue* the defendant is dangerous. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 720-721 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People* v. *Fierro*, *supra*, 1 Cal.4th at p. 249.)

Defendant contends the argument violated a court order, and was error in light of his two mistrial motions, one after the opening argument and one after the closing argument. The discussion during the first mistrial motion indicated that the court had ruled off the record that the district attorney's rebuttal evidence, including evidence of razor blades in jail, would be inadmissible under Evidence Code section 352. The settled statement indicates the court told the prosecutor it would only allow the two prior robbery convictions to be admitted as aggravating evidence.

During the second motion, defense counsel argued, "There is absolutely no evidence in the record one way or the other of future dangerousness in prison. [The district attorney] implied a great risk even though he understands I'm under order not to argue the contrary position. [¶] I think at this point his having argued it, at a minimum, I should be allowed to respond." Whatever "order" there may have been was not placed on the record. The settled statement indicates "that the Court advised Mr. Quatman that he could not argue future dangerousness. [¶] The Court has no recollection of Mr. Strellis saying that he wanted to argue future dangerousness." The court denied a mistrial, but allowed defense counsel to "say he's never killed anybody before." Counsel asked if he could "say he never assaulted anyone . . . [w]hich is factually correct." The court responded, "No." Defense counsel then argued to the jury, "Danger. My client spent more than half of his life of his adult life in prison. If he murdered someone, do you think we would have mentioned it to you? I mean, come, on. You have no evidence one way or the other on this issue."

It appears from this that, off the record, the court ruled inadmissible prosecution evidence regarding institutional misbehavior, may have placed restrictions on how the defense could argue defendant's good behavior, and told the prosecutor not to argue "future dangerousness." As discussed above, there should be no proceedings off the record. But we perceive no prejudice. A ruling *excluding* aggravating evidence could obviously only benefit defendant. There is no indication the court limited the defense presentation of evidence. It is clear the court did not believe the prosecutor violated its directive not to argue future dangerousness in his generic argument that defendant had killed before and might again. The restriction on argument of future dangerousness was undoubtedly tethered to the court's limitations on aggravating evidence.

Whether the court erred in limiting the defense argument is difficult to determine given the sparse record, but again there is no prejudice. The record is clear that no evidence regarding behavior in prison or jail—good or bad—was presented. The district attorney's argument that defendant might kill in prison was based solely on the crime of this case. We find no reasonable possibility the jury would have reached a different penalty determination had the defense argued there was no evidence defendant had assaulted anyone in prison.

Defendant also criticizes defense counsel for merely telling the jury there was no evidence he had killed in prison, rather than specifically denying that he had killed. It was, however, clear to the jury that only one murder had been proven. As noted, even the district attorney expressly stated there was only one murder. On this record, no reasonable juror would have returned a verdict of death because of unfounded speculation there was more than one murder.

 Defendant claims the district attorney improperly argued that none of defendant's family members asked the jury to spare his life. There was no objection, thus waiving the point. There was also no error. The district attorney did not argue this was aggravating, but was merely the absence of mitigation. The prosecutor may properly comment on defense evidence in mitigation. (*People* v. *Noguera* (1992) 4 Cal.4th 599, 644 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Pinholster, supra,* 1 Cal.4th at p. 972; cf. *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861] [prosecutor may not argue that the lack of mitigating evidence rendered the crime aggravated].)

Defendant argues counsel was ineffective regarding this argument. We disagree. Again, rather than object, defense counsel Strellis responded to the jury: "Now, I am not allowed under the law, as I understand the law, to ask—I guess he probably could ask the mother. It's not permissible I should ask the mother do you want your son executed. She'd say yes [*sic*]. He'd object. The Judge would say—I'm not allowed to ask that question." The district attorney objected. The court overruled the objection, stating that "[t]his is argument of counsel." Defense counsel continued: "But on cross, he has much wider latitude. [¶] Did you hear him ask? No. [¶] Any question in your mind what they want? [¶] Any validity in this argument, even that much?"

Defendant argues that counsel was wrong, that it *is* permissible for defense counsel to ask family members if they want the defendant executed. This may be correct, but we cannot determine on appeal the tactical reasons

for the approach counsel took. Counsel may have preferred this argument to having witnesses testify and be subject to cross-examination. Moreover, we do not know what the witnesses might have said if asked. There is no basis for finding ineffective assistance of counsel.

Defendant also challenges prosecution arguments that defendant's two children would be "better off without him"; that calling the children was "the cheapest trick of all," was "manipulating them," and was "cold and calculating"; and that even if defendant's father had abused him and turned him into a "homicidal maniac," that "just means that he's more dangerous than he ever was before." There was no objection, thus waiving the claims. Moreover, the argument was a proper response to the defense evidence in mitigation. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680] [the prosecutor may argue that "defendant's evidence under [Pen. Code, § 190.3, factor (k),] did not excuse his conduct —it made it worse. He was merely arguing the lack of weight of defendant's evidence"].)

Defendant also complains of argument that "[w]e haven't had an execution in the state of California since 1966. That's 21, 22 years ago." He claims the prosecutor improperly told the jury, in effect, the "execution won't happen," and thus minimized the jury's sense of responsibility for imposing the death penalty. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) There was no objection, so the claim has been waived. Moreover, in context, there was no impropriety. In his opening argument, defense counsel had described to the jury in vivid terms the horrors of an execution. The district attorney responded that counsel could not have been speaking from personal experience, since there had not been an execution for so long. There is no reasonable likelihood the jury misunderstood the comments in a manner that violates the rule of *Caldwell* v. *Mississippi, supra,* 472 U.S. 320. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 276 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

Finally, defendant claims, as he did at trial, that the district attorney violated the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] by arguing, "Not one person, not his mother, not his sister, not his ex-wife, told you about remorse, sorrow. None." We disagree. The statement was fair comment on the state of the evidence. (*People* v. *Mayfield, supra,* 5 Cal.4th at p. 178.) "[I]n the absence of a clear reference to a defendant's failure to testify, a prosecutor is free to make a logical comment on the defendant's lack of remorse." (*People* v. *Breaux, supra,* 1 Cal.4th at p. 313.)

### 4. *Instructional Issues*

 Defendant claims, in general, that the penalty phase instructions were "disorganized, confusing, and lacked the required guidance to assure [defendant] the precision necessary for individualized consideration." The instructions were, on the contrary, well organized and clear, and sufficiently guided the jury's consideration.

Moving to specific contentions, the court instructed the jurors to "consider, take into account, and be guided by the following factors in aggravation and mitigation, *if applicable*. . . ." (Italics added.) It did not list all the factors in Penal Code section 190.3, but only factors (a) (the circumstances of the crime), (c) (felony convictions), (i) (age), and (k) (the mitigation catchall). It also told the jury it could "consider sympathy or compassion for the defendant."

Reversing the common defense argument that the trial court is *required* to delete inapplicable mitigating factors (e.g., *People* v. *Malone* (1988) 47 Cal.3d 1, 47 [252 Cal.Rptr. 525, 762 P.2d 1249]), defendant argues the court erred in doing so. Although the court need not delete inapplicable factors (*ibid.*), it is not error of which defendant can complain to do what defendants have long urged. (See *People* v. *Edwards*, *supra*, 54 Cal.3d at p. 846.) The court listed all mitigating factors that had any possible relevance to this case. In light of the evidence of the 1961 robbery, however, it did inexplicably delete one clearly applicable aggravating factor, factor (b) (criminal activity involving force or violence). Omission of an *aggravating* factor could hardly have harmed defendant. In any event, since defendant was also convicted of the crime, the jury no doubt considered that evidence as a felony conviction.

Defendant also challenges the use of the phrase "if applicable." He claims the court, not the jury, must determine whether any factor applies. The phrase was appropriate. The jury ultimately determines whether any particular factor applies in any given case. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant next contends the court erroneously instructed on the catchall factor (k) of Penal Code section 190.3. The court told the jury it "may consider any other circumstance which extenuates the gravity of the crime, even though it's not a legal excuse for the crime. [¶] You may consider any other aspect of the defendant's character, his background, his history or record that he offers as a basis of a sentence less than death." This is actually broader than the formulation we suggested in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], and is

certainly broad enough to encompass all the evidence the defense presented. Defendant complains that this instruction "wrongly suggested that [he] had the burden of providing a 'basis of a sentence less than death.'" It did not. It merely told the jury it may consider any evidence the defendant did offer, nothing more.

Defendant contends the court erred by identifying his convictions to the jury. Such identification was probably unnecessary, but we see no error, and certainly no prejudice. It was undisputed that defendant suffered them. Moreover, the court also told the jury to consider them "if applicable." Defendant also contends the court improperly told the jury to "consider[] all the arguments of counsel," claiming this either invited or aggravated the alleged prosecutorial misconduct relating to aggravating factors. This standard instruction is taken almost verbatim from Penal Code section 190.3, and was entirely proper.

The court instructed, "A factor in aggravation must be proved beyond a reasonable doubt." This was unduly favorable to defendant, a point of which he can hardly complain. Except for evidence of other crimes, an aggravating factor need not be proved beyond a reasonable doubt. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221].) Defendant contends, however, that the instruction suggested to the jury that *he* had the same burden as to factors in mitigation. It did not.

Defendant reiterates other arguments that have already been rejected. The court need not instruct the jury which factors are aggravating and which are mitigating. (*People* v. *Raley* (1992) 2 Cal.4th 870, 919 [8 Cal.Rptr.2d 678, 830 P.2d 712].) The California legislative scheme and the factors in Penal Code section 190.3 are not unconstitutionally vague. (*Tuilaepa* v. *California* (1994) 512 U.S. __ [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808].) Consideration of age as a possible factor in either mitigation or aggravation was not improper. (*Tuilaepa* v. *California, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 762-763, 114 S.Ct. at pp. 2637-2638]; *People* v. *Hawthorne, supra,* 4 Cal.4th at pp. 77-79.)

## III. Conclusion

The judgment is affirmed.

Lucas, C. J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment. I am also in general agreement with the majority opinion by Justice Arabian and with the concurring opinion by Justice George.

I write separately for one purpose, and for one purpose alone.

For 15 years, the Legislature has had before it an invitation to prohibit trial courts from attempting to define proof beyond a reasonable doubt in their jury instructions in criminal cases. (See *People* v. *Brigham* (1979) 25 Cal.3d 283, 292-316 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.).)

The invitation was extended at that time because *any* purported instructional definition of reasonable doubt—including, and perhaps especially, that which is deemed standard—was seen to run a substantial risk of violating the due process clause of the Fourteenth Amendment to the United States Constitution, which, in the words of *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068], "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*People* v. *Brigham, supra,* 25 Cal.3d at p. 293 (conc. opn. of Mosk, J.).)

The risk of a violation of the Fourteenth Amendment's due process clause is even more substantial today. Indeed, it may now be characterized as grave. (See generally, *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239].)

During the past 15 years, however, the Legislature has not acted. It shows no sign of acting now. Against its omission, we should take steps. In so doing, we would not trench on the legislative sphere. We would merely carry out our paramount obligation to enforce the United States Constitution, which is of course "the supreme law of the land" (Cal. Const., art. III, § 1). For we are required not only to remedy federal constitutional violations committed in the past, but also to prevent similar violations arising in the future.

Therefore, under the Fourteenth Amendment's due process clause, I would henceforth prohibit trial courts from attempting any instructional definition of proof beyond a reasonable doubt.

**GEORGE, J.**—I concur in the thoughtful analysis set forth in the court's opinion. I write separately to echo the court's request that the Legislature address the numerous concerns regarding the clarity of California's standard reasonable doubt instruction, CALJIC No. 2.90, pointedly expressed by the United States Supreme Court in *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th

155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862]. (See maj. opn., *ante*, pp. 501-505.)[1]

In tracing the origins of CALJIC No. 2.90 to a charge given more than a century ago in *Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295, 320, the high court in *Victor* summarized certain relevant judicial and legislative commentary, observing: "The California instruction [CALJIC No. 2.90] was criticized in *People* v. *Brigham* [(1979)], 25 Cal.3d 283, 292-316 [(]157 Cal.Rptr. 905, 911-926, 599 P.2d 100, 106-121[)] (Mosk, J., concurring). Justice Mosk apparently did not think the instruction was unconstitutional, but he 'urge[d] the Legislature to reconsider its codification.' [Citation.] The California Assembly and Senate responded by requesting the [CALJIC Committee] 'to study alternatives to the definition of "reasonable doubt" set forth in Section 1096 of the Penal Code, and to report its findings and recommendations to the Legislature.' [(]Cal. Assem. Con. Res. No. 148, 1986 Cal. Stats. 5634.[)] The committee recommended that the legislature retain the statutory definition unmodified, see Alternative Definitions of Reasonable Doubt: A Report of the Committee on Standard Jury Instructions —Criminal to the California Legislature (May 22, 1987), and § 1096 has not been changed." (*Victor* v. *Nebraska*, *supra*, 511 U.S __ [127 L.Ed.2d at p. 593, 114 S.Ct. at p. 1245].)

In the report cited in *Victor*, Alternative Definitions of Reasonable Doubt, approved by the Committee on Standard Jury Instructions—Criminal of the Los Angeles Superior Court on February 19, 1987, and reprinted by the Los Angeles Daily Journal on May 22, 1987, as Report No. 87-10 (the CALJIC Report), the CALJIC Committee considered various criticisms that had been directed toward California's standard reasonable doubt instruction, studied similar instructions given in other jurisdictions, and concluded, inter alia, that "the Legislature should *retain* the present definition of reasonable doubt," observing that "the definition [of reasonable doubt] embodied in [Penal Code] section 1096 has survived . . . all appellate challenges and efforts to modify and improve it." (CALJIC Rep., *supra*, at pp. 7-8, italics

---

[1]The high court in *Victor*, *supra*, 511 U.S. at pp. __ [127 L.Ed.2d at pp. 594, 594, 596-597, 114 S.Ct. at pp. 1246, 1248], observed that the term "moral evidence," contained within California's standard reasonable doubt instruction, *"is not a mainstay of the modern lexicon,"* and, as to the instruction's inclusion of the words "moral certainty," the court commented, *"we do not condone use of the phrase."* (Italics added.) The court further observed that *"the definitions of reasonable doubt most widely used in the federal courts do not contain any reference to moral certainty."* (*Id.*, at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248], italics added; see also 1 Devitt et al., Federal Jury Practice and Instructions, Civil and Criminal (4th ed. 1992) § 12.10 at pp. 353-372 [surveying the decisions from several federal circuit courts, and setting forth the federal court pattern jury instruction, which defines "reasonable doubt" as "a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act"].)

added [citing *People* v. *Paulsell* (1896) 115 Cal. 6, 12 [46 P. 734]; *People* v. *Chun Heong* (1890) 86 Cal. 329, 332 [24 P. 1021]; *People* v. *Strong* (1866) 30 Cal. 151, 155].)

I was one of two members of the CALJIC Committee (the Honorable Norman L. Epstein being the other) who, in light of the archaic and confusing language set forth in CALJIC No. 2.90, disagreed with the recommendation of the CALJIC Committee that the Legislature retain the reasonable doubt instruction in its present form. I continue to adhere to the views expressed in our 1987 minority report, and set them forth at some length in an attempt to persuade the Legislature to amend Penal Code sections 1096 and 1096a:

"We respectfully disagree with the principal conclusion reached in the scholarly and well-written report of the 'Reasonable Doubt' subcommittee, and endorsed by the CALJIC Committee: that Pen[al] C[ode] sections 1096 and 1096[a], and CALJIC [No.] 2.90 should not be changed.

"Every judge who has given the present reasonable doubt instruction, and every attorney who has participated in a case in which it was given, is aware of its deficiencies. And every juror who has heard it and tried to apply it must have been baffled. The reason is that the present formulation is not only internally inconsistent and confusing, but borrows as its central phrase in explanation of reasonable doubt, a bit of early 19th Century philosophical arcana that few understood then and none comprehend now.

"The first paragraph of the instruction states a rule in plain English that everyone can understand: in criminal cases, defendants are presumed to be innocent until guilt is proved; if there is a reasonable doubt about guilt, they are entitled to an acquittal; and the effect of this is to place on the State the burden of proving guilt beyond a reasonable doubt.

"The second paragraph begins with a promise to define reasonable doubt. It never does. A juror attentively listening to this instruction must wonder where he or she went wrong, because the paragraph is inconsistent in purporting to define the phrase, yet not doing so.

"What it does do is impart an element of confusion that is never resolved. It refers to 'moral evidence,' a term never defined and certainly not a matter of common understanding.

"And it follows that by an equally confusing reference to 'a moral certainty.' The apparent origins of these terms, traced to an 1850 opinion of the Massachusetts Supreme Court, are discussed in Justice Mosk's brilliant essay on the reasonable doubt instruction. [See *People* v. *Brigham* (1979) 25 Cal.3d 283, 292 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.).]

"Justice Mosk is correct in his conclusion that the deficiencies of the instruction are 'glaring.' And his solution is equally correct: do not attempt a definition of reasonable doubt, because the term is simply not definable in any way that would improve its comprehensibility. Certainly the present formulation does not enlighten its meaning.

"There are some terms and concepts that defy usable definition. Love, hope, specific colors, and many others come to mind. The concept of reasonableness is the most common, and we find it used throughout the standard jury instructions. Save in this one instance, it is *never* defined.

"And there is no evidence that a definition is needed. As Justice Mosk pointed out, there are many terms used in instructing juries in criminal cases of which 'it can be said that "a jury which did not understand them would not understand an explanation of them." [Citation.] Certainly this is true of the "explanation" of reasonable doubt currently embodied in section 1096 and in the many other definitions proposed over the years.' (*People* v. *Brigham*, *supra*, 25 Cal.3d at [pp.] 314-315.)

"Against this, two arguments are raised: unless reasonable doubt is defined, juries will ask what it means and judges will err in trying to respond to their questions; and any change risks wholesale reversals of convictions. Neither argument stands scrutiny.

"The short answer to the first is that the same problem exists now in terms of jury questions about 'moral certainty.' Trial judges have attempted answers to these questions, and have erred, by informing juries that the concept is the opposite of 'immoral certainty,' or that it has a religious connotation. The better response, and the one most commonly used, is not to define it.

"It is likely that the attempt to define reasonable doubt in the present instruction raises more questions in the minds of jurors than would an instruction without a definition of that term. The majority report points out that 'Judges in those states where reasonable doubt is not defined rarely receive a request for a definition from jurors.' Pen[al] C[ode] section 1096a provides that no instruction other than that set forth in section 1096 need be given; that provision could be made mandatory.

"There is simply no basis to apprehend that a reasonable doubt instruction in the terms of the present first paragraph, and mandated by the Legislature, would be found constitutionally insufficient. No case has been cited or found that reached such a conclusion. [*In re Winship* (1970) 397 U.S. 358, 364 (25 L.Ed.2d 368, 375, 90 S.Ct. 1068)] was the first U.S. Supreme Court case to explicitly hold that the Due Process Clause protects an accused against conviction except upon [proof beyond a] reasonable doubt. But neither that case nor any later decision has prescribed any particular definition of the

concept. Certainly none has required 'moral evidence' or 'moral certainty' as constitutional imperatives. And, as the majority report discloses, most American jurisdictions do not employ these phrases in defining reasonable doubt, and several do not attempt any definition of the term.

"The majority justices in *Brigham* recognized the force of Justice Mosk's criticism of the present provision. They acknowledged that he 'is correct when he criticizes the standard definition of reasonable doubt contained in CALJIC [No.] 2.90. The Legislature should be encouraged to clarify this important area of the law.' [(]*People* v. *Brigham*, *supra*, 25 Cal.3d at [p.] 290, fn. 11.[)]

"A similar question was before the [California] Supreme Court within the last year. In *People* v. *Rodriguez* [(1986)] 42 Cal.3d 730, 780 [], the special circumstance of killing a person one knows or *reasonably should have known* to be an on-duty police officer (Pen. C[ode §] 190.2[, subd.](a)(7)) was attacked as too vague for a death penalty standard. The court upheld it. The defendant argued that the court has a *sua sponte* duty to instruct on the meaning of 'reasonably should have know[n].' But 'any instruction elaborating on the term "reasonable" would add little, if anything, to the understanding of most jurors.' (42 Cal.3d at [p.] 782.) And '[s]uch an instruction could do little more than inform the jury that "reasonable" means "what an average person of average intelligence would have known under the circumstances." ' (42 Cal.3d at p. 782, fn. 19.)

"The United States Supreme Court reached a similar conclusion over 30 years ago: 'A definition of a doubt as something the jury would act upon would seem to create confusion rather than misapprehension. "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." [(*Miles* v. *United States* (1880) 103 U.S. 304, 312 [26 L.Ed. 481, 484].)]' [(*Holland* v. *United States* (1954) 348 U.S. 121, 140 [99 L.Ed. 150, 166-167, 75 S.Ct. 127].)]

"In light of these authorities, and others, and the absence of any to the contrary, it is not credible that an instruction that does not define reasonable doubt would be unconstitutional. Indeed, as we have seen, the present instruction purports to define it but does not.

"· · · · · · · · · · · · · · · · · · · · · · · · ·

"It is the purpose of a court's charge to the jury to explain the governing legal principles that the jurors must apply, in terms that they can understand. To instruct in terms that no one understands, or can understand, is at best unfair to the jury and to the litigating parties. At worst, it is the kind of error *that undermines confidence in the jury process.*

"The [California] Supreme Court was right in inviting the Legislature to clarify the reasonable doubt instruction. The Legislature was wise in seeking

the advice of this Committee in approaching this task. We do it no service in advising that there is nothing to clarify." (Minority Report to CALJIC Rep., pt. 10, at pp. 51-53, original italics.)

To the foregoing, I would add only that the high court's criticism of CALJIC No. 2.90 in *Victor*, *supra*, 511 U.S. __ [127 L.Ed.2d at pp. 594-597, 114 S.Ct. at pp. 1247-1248], commands attention. Somewhat ominously, that court observed that "the common meaning of the phrase [moral certainty] has changed since it was used in the [1850] *Webster* instruction, and it may continue to do so to the point that it conflicts with the [constitutional] standard." (*Id.*, at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248].) Noteworthy, too, are the following observations made by Justice Kennedy in his concurring opinion in *Victor*:

"[A]s the Court makes clear, what once might have made sense to jurors has long since become archaic. In fact, some of the phrases [set forth in CALJIC No. 2.90] confuse far more than they clarify.

"Though the reference to 'moral certainty' is not much better, California's use of 'moral evidence' is the most troubling, and to me seems quite indefensible. The derivation of the phrase is explained in the Court's opinion, but even with this help the term is a puzzle. And for jurors who have not had the benefit of the Court's research, the words will do nothing but baffle.

"I agree that use of 'moral evidence' in the California formulation is not fatal to the instruction here. I cannot understand, however, why such an unruly term should be used at all when jurors are asked to perform a task that can be of great difficulty even when instructions are altogether clear. The inclusion of words so malleable, because so obscure, might in other circumstances have put the whole instruction at risk." (*Id.*, at p. __ [127 L.Ed.2d at p. 601, 114 S.Ct. at p. 1251].)

As the court aptly has stated in the case now before us: "The clarity and constitutionality of California's instruction on reasonable doubt are too important to simply ignore the high court's warning signals." (Maj. opn., *ante*, at p. 504.) I concur in these views, again adding my voice to the many who have lamented the unnecessary and indecipherable phraseology of CALJIC No. 2.90, and who have recommended that the Legislature amend Penal Code sections 1096 and 1096a to provide a more comprehensible and helpful instruction to guide California jurors in future criminal cases.

Appellant's petition for a rehearing was denied January 5, 1995.